**Affirmed as Modified, and Majority and Concurring and Dissenting Opinions filed December 17, 2019.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-18-00083-CV

---

### JAMES CONSTRUCTION GROUP, LLC AND PRIMORIS SERVICES CORPORATION, Appellants/Cross-Appellees

### V.

### WESTLAKE CHEMICAL CORPORATION, Appellee/Cross-Appellant

---

**On Appeal from the 334th District Court
Harris County, Texas
Trial Court Cause No. 2014-72717**

---

## M A J O R I T Y   O P I N I O N

James Construction Group, LLC ("James"), Primoris Services Corporation ("Primoris"), and Westlake Chemical Corporation ("Chemical") appeal a judgment adjudicating their respective contract claims, which arose out of a construction agreement between Chemical and James. Following a jury trial, the trial court signed a judgment awarding Chemical $1,157,019.50 in breach-of-contract damages against James and Primoris, jointly and severally, and $2,923,600.50 in attorney's

fees against Primoris only. The judgment also awards James $1,270,962.89 in breach-of-contract damages against Chemical on James's counterclaim. Each party raises multiple issues on appeal. For the reasons explained below, we modify the judgment and affirm the judgment as modified.

## General Background

Chemical and James signed a construction contract providing for James to perform over $500 million in civil and mechanical construction work at a chlor-alkali chemical plant owned by Westlake Vinyls Company, L.P. ("Vinyls"). Although Chemical signed the contract in its own name, Vinyls authorized Chemical to sign it on Vinyls's behalf, and the jury found that Chemical was acting as Vinyls's agent in entering the contractual relationship. In a separate agreement (the "Guaranty"), James's parent company, Primoris, unconditionally guaranteed James's performance under the construction contract.

Following various disputes during the project Chemical filed this lawsuit, and the parties asserted breach-of-contract claims against each other. We first summarize the general nature of the claims at issue and then detail additional pertinent facts in connection with their related issues.

### A.    Summary of Chemical's claims

Chemical's claims against James mainly involve allegations that James breached contract provisions requiring it to perform work safely and to compensate Chemical for remedial or termination costs resulting from unsafe work. Chemical contends that due to James's safety violations Chemical intervened and terminated some or all of James's scope of work in accordance with Chemical's contract rights. Chemical sought to recover damages allegedly incurred in exercising those rights and hiring others to complete the job.

2

Chemical's claims are grounded on two key contract provisions. First, paragraph 17.2, entitled "Inspection and Intervention," provides that Chemical may "intervene in any appropriate way" if, in its reasonable opinion, James performs its contractual duties in an unsafe manner. In that instance, Chemical has the right to require James to take immediate remedial action to Chemical's satisfaction. James is solely accountable for all costs associated with such intervention and remedial action, whether those costs are incurred by Chemical, James, or any third party.

Another section, paragraph 21, applies to "Termination and Substitute Performance." Specifically, paragraph 21.3 enumerates Chemical's right to terminate the contract for James's default, including for serious safety violations. Paragraph 21.3 sets forth the relevant contractual sequence of events as follows: if Chemical determines in its reasonable opinion that James has "serious safety violations," then Chemical may so notify James. Upon notification, James must begin to remedy the defect cited within a certain period. If Chemical is not reasonably satisfied with the pace or quality of the remediation effort, Chemical must notify James of that fact and may elect to terminate the contract or a portion of the work by providing notice to that effect. After providing notice, Chemical has the right to take unrestricted possession of the work or portion terminated and pay for its completion. Any extra cost in excess of the contract price incurred by Chemical in completing the terminated work is at James's expense.

Chemical also asserts a claim under the contract's indemnity provision, paragraph 19.1. Chemical avers that James's employee died while performing work under the contract, that Chemical incurred expenses in defending a wrongful-death claim asserted by the employee's family, and that James breached paragraph 19.1 by failing to indemnify Chemical for its costs resulting from the claim.

3

At trial, Chemical contended its damages resulting from James's breaches exceeded $8.5 million.

Finally, Chemical sued Primoris for breach of the Guaranty, contending that Primoris was liable for all contract damages owed by James.

## B.      Summary of James's claims

James's counterclaims also rest in part on paragraph 21.3.  James alleges that Chemical breached paragraph 21.3 by (1) improperly terminating James's work because Chemical's grounds for termination were unreasonable, and (2) failing to provide the notice paragraph 21.3 requires.

James also contends that Chemical violated paragraph 26 of the contract, which is entitled "Waiver of Consequential Damages" and states among other things that neither party shall be liable to the other for any "consequential, incidental, indirect or punitive damages of any kind or character," and "no claim shall be made" by either party against the other for such damages regardless of the legal theory supporting the claim.  According to James, all of Chemical's asserted contract damages are consequential in nature and barred by paragraph 26.

## C.      Summary of the jury findings and judgment

Following a multi-week trial, a jury made the following relevant findings:

1.      Chemical entered into the construction contract in its own name but with authority to act on behalf and for the benefit of Vinyls.  The jury also found that James was estopped from denying that Chemical entered into the construction contract with Vinyls's authority and on Vinyls's behalf.

2.      James failed to comply with paragraph 17.2, the "intervention" provision.  The jury awarded Chemical $1,054,251.81 as a result of this breach.

4

3. James failed to comply with paragraph 21.3, the "termination" provision; and Chemical substantially complied with that paragraph's notice provisions. The jury awarded Chemical $1,054,251.81 as a result of this breach.[1] Due to the jury's findings in Chemical's favor, it did not answer a series of questions on James's counterclaims under paragraph 21.3.

4. James failed to comply with paragraph 19.1, the "indemnity" provision. The jury awarded Chemical $102,767.69 as a result of this breach.

5. Chemical incurred $2,923,600.50 in reasonable and necessary attorney's fees through trial and would incur up to an additional $450,000 in attorney's fees in the event of appeal.

6. Chemical failed to comply with paragraph 26, the waiver of consequential damages provision. The damages awarded for this breach were divided into two categories. The jury awarded James $238,778.26 for attorney's fees incurred in defending against "chlorine costs" asserted by Chemical.[2] Additionally, the jury awarded James a total of $1,032,184.63 for attorney's fees incurred through trial (plus $62,500 in appellate fees) in defending against "consequential damages other than chlorine costs" asserted by Chemical.

After several post-verdict motions, the trial court signed an amended judgment incorporating the above findings. The judgment grants recovery to Chemical against James and Primoris, jointly and severally, for contract damages of $1,157,019.50, plus interest and taxable court costs. The judgment grants recovery to Chemical for its attorney's fees of $2,923,600.50 against Primoris only, based on the Guaranty, plus conditional appellate attorney's fees.[3] The judgment grants

---

[1] These were the same damages awarded in connection with James's breach of paragraph 17.2.

[2] Prior to trial, the trial court granted James partial summary judgment on its consequential-damages counterclaim and determined that several million dollars in "chlorine costs" Chemical sought were barred by paragraph 26. Chemical agrees that the "chlorine costs" it asserted are barred, and Chemical does not challenge this summary-judgment ruling on appeal.

[3] The trial court refused to enter judgment against James for Chemical's attorney's fees incurred in pursuing its contract claims because James is a limited liability company. *See* Tex. Civ. Prac. & Rem. Code § 38.001 (permitting recovery of attorney's fees from an individual or

recovery to James against Chemical for contract damages of $1,270,962.89, plus conditional attorney's fees on appeal. All parties timely appealed.

## Issues Presented

James and Primoris present seven issues for review. Because many of their arguments overlap, we refer to James and Primoris collectively as "appellants" when discussing their joint contentions. In their first three issues, appellants argue that the trial court erred in rendering judgment for Chemical on Chemical's claims under the contract's termination (paragraph 21.3), intervention (paragraph 17.2), and indemnification (paragraph 19.1) provisions. In issues four and five, Primoris challenges the trial court's award of attorney's fees to Chemical. James urges in issue six that the trial court erred in refusing to award it prejudgment interest on its counterclaim for breach of paragraph 26. Finally, in issue seven James complains that the trial court erred in rendering a take-nothing judgment in Chemical's favor on James's counterclaim under paragraph 21.3.

Chemical challenges the judgment in two cross-issues. First, Chemical contends the trial court erred in rendering judgment for James on James's counterclaim for breach of paragraph 26. Second, Chemical argues that the trial court erred in holding only Primoris liable for Chemical's attorney's fees, when James should be liable for the fees as well.

We begin with appellants' complaints.

---

corporation for certain claims); *Vast Constr., LLC v. CTC Contractors, LLC*, 526 S.W.3d 709, 728 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (holding attorney's fees may not be recovered from an LLC under chapter 38); *Alta Mesa Holdings, L.P. v. Ives*, 488 S.W.3d 438, 452-55 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (same).

6

**Analysis**

**Appellants' Issues**

**A.     Termination — Paragraph 21.3**

In issue one, appellants challenge the judgment against them on Chemical's claim for breach of the contract's termination provision.  Appellants contend that: (1) no evidence supports the jury's liability finding; (2) Chemical failed to comply with all conditions precedent to its right to terminate the contract for default and recover damages because it did not strictly comply with paragraph 21.3's notice provisions, and alternatively the jury's substantial compliance findings regarding notice are unsupported by evidence or pleading; and (3) the jury's damage awards are either unsupported by evidence or barred by paragraph 26.

1.     *Standards of review*

When reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the judgment and indulge every reasonable inference that would support it.  *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005).  We credit favorable evidence if a reasonable fact finder could and disregard contrary evidence unless a reasonable fact finder could not.  *Id*. at 807, 827; *Vast Constr.*, 526 S.W.3d at 719.  If there exists more than a scintilla of evidence to support the judgment, we must uphold it.  *Coffman v. Melton*, 448 S.W.3d 68, 71 (Tex. App.— Houston [14th Dist.] 2014, pet. denied).  More than a scintilla of evidence exists when the evidence supporting the finding rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.  *Id*.

We sustain a legal sufficiency or "no evidence" challenge only when:  (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to

prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *Regal Fin. Co. v. Tex Star Motors, Inc.*, 355 S.W.3d 595, 603 (Tex. 2010) (citing *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). We apply this standard mindful that the jury is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *See City of Keller*, 168 S.W.3d at 819, 822.

We construe contracts as a matter of law, absent ambiguity. *Moayedi v. Interstate 35/Chisam Rd., L.P.*, 438 S.W.3d 1, 7 (Tex. 2014). Our primary concern is to ascertain and give effect to the parties' true intentions as expressed in the agreement. *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 805 (Tex. 2012). We consider the entire writing and attempt to harmonize and give effect to all the provisions of the contract by analyzing them mindful of the whole agreement. *See Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 311-12 (Tex. 2005) (per curiam). "No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003).

2.      *Legal sufficiency challenge to the liability finding*

In the first part of their first issue, appellants challenge the legal sufficiency of the evidence to support the jury's liability finding in response to question 3D, which asked whether James breached paragraph 21.3. As relevant, paragraph 21.3 provides:

21    **TERMINATION AND SUBSTITUTE PERFORMANCE**

. . .

21.3    <u>Right of Company to Terminate for Contractor Default</u>.  If [Chemical] discovers or determines, in its reasonable opinion that:

. . .

21.3.2  [James] has serious safety violations; . . .

then [Chemical] may so notify [James].  Upon receipt of any such notice, [James] shall begin to remedy the breach or defect cited within seventy-two (72) hours.  If at any time, [Chemical] is not reasonably satisfied with the pace and the quality of the remediation effort, [Chemical] will so notify [James] and [Chemical] may thereafter, at its sole discretion, elect to either terminate this Contract or a portion of the Work by providing notice to that effect.  After providing such notice, [Chemical] shall have the unrestricted right to take possession of the Work or the portion thereof terminated and to purchase and/or hire materials, tools, supervision, labor, and equipment for the completion of the Work or of the unremedied condition, as [Chemical] elects.  Any extra costs in excess of the Contract Price incurred by [Chemical] in this regard shall be at the expense of [James].  This right is in addition to any other remedies [Chemical] may have hereunder.

In question 3D, the jury was asked:

Did James fail to comply with Section 21.3 of the Construction Contract?

You are instructed that James failed to comply with Section 21.3 of the Construction Contract if all of the following circumstances occurred:

- Westlake Chemical discovered or determined in its reasonable opinion that James had serious safety violations, and

- Westlake Chemical was not reasonably satisfied with the pace and the quality of the remediation effort; and

- Westlake Chemical terminated the Construction Contract or a portion of the Work, and took possession of the Work or the portion

thereof terminated and purchased and/or hired materials, tools, supervision, labor, and equipment for the completion of the Work; and

- James has not paid Westlake Chemical for some or all of the extra costs in excess of the Contract Price incurred by Westlake Chemical in regards to taking possession of the Work or the portion thereof terminated and purchasing and/or hiring materials, tools, supervision, labor, and equipment for the completion of the Work.

The jury found that James failed to comply with paragraph 21.3. In response to the next question, question 3E, the jury awarded Chemical $1,054,251.81 as fair and reasonable compensation for James's failure to comply. The damages were divided into two categories: (1) $211,836.81 in "safety training costs," and (2) $842,415 in "increased foreman costs."[4]

To recover on a breach-of-contract claim, a party must prove: (1) the existence of a valid contract, (2) the party performed, tendered performance, or was excused from doing so, (3) the other party breached the contract, and (4) damages resulting from the breach. *See Vast Constr.*, 526 S.W.3d at 718 n.6; *Aguiar v. Segal*, 167 S.W.3d 443, 450 (Tex. App.—Houston [14th Dist.] 2005, pet. denied).

The essence of appellants' point is that there is no evidence that Chemical incurred any termination costs. Emphasizing the charge instruction that an affirmative answer to question 3D must be predicated on proof that the extra costs were "incurred by Westlake Chemical," appellants say the jury finding is not supported by legally sufficient evidence because all the costs awarded were incurred by *Vinyls*, not Chemical. In response, Chemical argues that it is legally entitled to

---

[4] Chemical separated its claimed damages into various categories, labelled in the jury charge as A-E and F1-F8. The jury awarded breach-of-contract damages in two categories, A (safety training costs) and D (increased foreman costs). The jury awarded no damages for the remaining categories.

10

recover damages incurred by Vinyls because Chemical is Vinyls's agent with respect to the construction contract, as the jury found.[5]

Appellants are correct that Vinyls incurred the termination costs underlying the jury's award. Andrew Kenner, who served as vice-president of manufacturing for both Chemical and Vinyls, testified that Vinyls controlled the construction project on its property and "paid the bills." Of the damages sought, Kenner stated that the only portion paid by Chemical was the cost related to the indemnification

---

[5] In questions 1A and 1B, the jury was asked the following:

Question No. 1A

Did Westlake Chemical enter into the Construction Contract in its own name, to obtain construction services by James, on behalf and for the benefit of Westlake Vinyls, and with authority to act on behalf of Westlake Vinyls?

Westlake Chemical had authority to act on behalf of Westlake Vinyls in entering into the Construction Contract with James if Westlake Chemical had actual authority to do so. Actual authority for Westlake Chemical to act for Westlake Vinyls must arise from Westlake Vinyls' agreement that Westlake Chemical act on behalf and for the benefit of Westlake Vinyls.

Question No. 1B

Does James's conduct preclude it from denying that Westlake Chemical entered into the Construction Contract in its own name, to obtain construction services by James, on behalf and for the benefit of Westlake Vinyls, and with authority to act on behalf of Westlake Vinyls?

The law precludes James from asserting, to Westlake Chemical's disadvantage, a right or position that is inconsistent with a position previously taken by James while it had knowledge of all material facts. This legal principle applies if it would be unconscionable to allow James to avoid corresponding obligations or effects by maintaining a position inconsistent with one to which it earlier acquiesced or from which it earlier accepted a benefit while having knowledge of all material facts.

The jury answered "yes" to both questions. Chemical asserts without dispute that the jury's affirmative answers to questions 1A and 1B establish a principal-agent relationship between Vinyls and Chemical with respect to the construction contract.

11

claim based on the death of James's employee. He said all other damage elements were based on costs paid by Vinyls. Further, it is undisputed that Turner Industries, which replaced James as the mechanical contractor on the project, operated under a contract with Vinyls, not Chemical. Bryan Byrd, Chemical's damage expert, stated that the payments to all major contractors, including Turner, came from Vinyls, even though other documents referenced Chemical. Byrd did not distinguish between Vinyls and Chemical for purposes of his review and considered both entities simply as "Westlake."

It is also true that Vinyls and Chemical are distinct corporate entities and they are correctly treated as such in the jury charge.[6] But we ultimately conclude nonetheless that question 3D's reference only to Chemical and not Vinyls does not permit us to sustain appellants' legal sufficiency challenge under the present circumstances. We reach this conclusion for several reasons.

First, appellants do not challenge the agency findings on appeal, so the relationship between Vinyls as principal and Chemical as agent is established conclusively, and we are bound by those findings. *See, e.g.*, *IKB Indus. v. Pro-Line Corp.*, 938 S.W.2d 440, 445 (Tex. 1997) (appellate courts are bound by unchallenged jury findings); *Carbona v. CH Med., Inc.*, 266 S.W.3d 675, 687 (Tex. App.—Dallas 2008, no pet.); *OXY USA, Inc. v. Cook*, 127 S.W.3d 16, 21 (Tex. App.—Tyler 2003, pet. denied). We measure the sufficiency of the evidence by the charge as given. *See Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 254 (Tex. 2008); *TecLogistics, Inc. v. Dresser-Rand Grp., Inc.*, 527 S.W.3d 589, 595 (Tex. App.—Houston [14th Dist.] 2017, no pet.). In doing so, we consider

---

[6] The charge provides that "'Westlake Chemical' refers to Plaintiff Westlake Chemical Corporation." Additionally, it defines "Westlake Vinyls" as "Westlake Chemical's subsidiary, Westlake Vinyls Company, L.P."

unchallenged and binding jury findings in one part of the charge to the extent they are relevant when we review the evidentiary sufficiency of other findings. *See Venture v. UTSW DVA Healthcare, LLP*, 559 S.W.3d 155, 160 (Tex. App.—Dallas 2015) (noting unchallenged findings on prior material breach were binding and defeated appellant's challenges to other findings), *aff'd in part, rev'd in part on other grounds*, 578 S.W.3d 469 (Tex. 2019); *see also Eagle Oil & Gas Co. v. TRO-X, L.P.*, 416 S.W.3d 137, 148-49 (Tex. App.—Eastland 2013, pet. denied) (reviewing legal sufficiency challenge, court examined instructions from charge as a whole, not only instructions in the question at issue; charge as a whole was pertinent to issue). We thus consider the jury's agency findings and their legal consequences in our no-evidence review of question 3D, and appellants do not contend that we should do otherwise.

As an agent, Chemical is Vinyls's fiduciary. *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 200 (Tex. 2002) (agency is special relationship that gives rise to a fiduciary duty); *see Robles v. Consol. Graphics, Inc.*, 965 S.W.2d 552, 558 n.4 (Tex. App.—Houston [14th Dist.] 1997, pet. denied); *Rauscher Pierce Refsnes, Inc. v. Great Sw. Sav., F.A.*, 923 S.W.2d 112, 115-16 (Tex. App.—Houston [14th Dist.] 1996, no writ); *West v. Touchstone*, 620 S.W.2d 687, 690 (Tex. App.—Dallas 1981, writ ref'd n.r.e.) ("the relationship between an agent and principal is a fiduciary one"); Restatement (Third) of Agency § 1.01 (2006). Once the principal-agent relationship is established, the agent's acts are the principal's acts for the limited purpose and scope of the agency relationship authorized by the principal. What a principal does through an agent it does itself. *Shaw v. Kennedy, Ltd.*, 879 S.W.2d 240, 245 (Tex. App.—Amarillo 1994, no writ). Thus, agent and principal generally are considered one and the same with respect to acts within the relationship's scope. *See Holloway v. Skinner*, 898 S.W.2d 793, 795 (Tex. 1995) (stating that agent cannot

13

tortiously interfere with principal's contract because agent and principal are "one and the same").

As the jury found, Chemical signed the construction contract on behalf and for the benefit of Vinyls. Historically in Texas, agents cannot sue on contracts entered into on their principal's behalf. *See Tinsley v. Dowell*, 26 S.W. 946, 948 (Tex. 1894). But the Supreme Court of Texas has long recognized four exceptions to this rule: (1) when the agent contracts in his own name; (2) when the principal is undisclosed; (3) when the agent is authorized to act as owner of the property; and (4) when the agent has an interest in the contract's subject matter. *Id*. The first exception applies here because Chemical undisputedly signed the construction contract in its own name. An agent may sue in his own name when the agent contracts in his own name. *See Perry v. Breland*, 16 S.W.3d 182, 187 (Tex. App.— Eastland 2000, pet. denied).[7] In Texas, a contracting agent's right to enforce a contract on the principal's behalf has arisen in the context of standing challenges,[8] and in response to arguments that the principal is an indispensable party.[9] In each circumstance, courts have held that an agent who is a contracting party may sue in

---

[7] *See also* Restatement (Second) of Agency §§ 363, 364 (1958) ("A person with whom an agent makes a contract on behalf of a principal is subject to liability in an action brought thereon by the agent in his own name on behalf of the principal if the agent is a party promisee."). This is true not only in Texas but in other jurisdictions as well. *E.g.*, *Curo Enters. v. Dunes Residential Servs., Inc.*, 51 Kan. App. 2d 77, 342 P.3d 948 (2015) (agent may sue in own name to enforce contract made on principal's behalf); *Barclae v. Zarb*, 300 Mich. App. 455, 834 N.W.2d 100 (2013) (same); *Earl Fruit Co. v. Herman*, 90 Cal. App. 640, 644-45 (1928) ("The right of an agent to sue on a contract which has been entered into in his own name has met with universal recognition.").

[8] *See Perry*, 16 S.W.3d at 187-88; *see also Kakahadze v. M5 Int'l Co.*, No. H-12-3701, 2014 WL 2547767, at *3-4 (S.D. Tex. June 5, 2014) (rejecting standing challenge based on agent's right to assert contract claim under Texas law).

[9] *See Cleveland v. Heidenheimer*, 46 S.W. 30, 32 (Tex. 1898); *Tex. Gas Corp. v. Hankamer*, 326 S.W.2d 944, 958-59 (Tex. App.—Houston 1959, writ ref'd n.r.e.) (agent that "contracted in his own name" when selling gas and distillate of another company to defendants was entitled to "sue in his own name").

the agent's own name on the principal's behalf. Thus, when, as here, the agent is a party to a contract for a disclosed principal, the agent may sue on the contract in the agent's name, the principal's name, or both. *See* Restatement (Third) of Agency § 6.01 cmt. e (2005). Chemical, the named plaintiff, pleaded that it brought suit as agent of Vinyls and on Vinyls's behalf.

More to the point, an agent's right to enforce the contract by legal action on the principal's behalf includes the right to recover damages suffered by the principal alone. *See* Restatement (Second) of Agency § 364 cmt. k ("If the agent brings an action in his own name but on account of the principal, he sues as a fiduciary and hence he recovers the full measure of damages although he is personally caused no pecuniary loss by the failure of the third person to perform."); *see also Brooks v. Hollaar*, 297 P.3d 125, 129 (Alaska 2013) (agent may sue on contract in own name to recover principal's damages) (citing Restatement (Second) of Agency § 364 cmt. k).[10] In a non-precedential opinion, *Texas Utilities Fuel Co. v. Marathon Oil Co.*, No. 11-98-00079-CV, 2000 WL 34234653 (Tex. App.—Eastland Mar. 9, 2000, no pet.) (not designated for publication),[11] Texas Utilities Fuel Company ("TUFCO") contracted to purchase gas from the defendant Marathon, but the gas was to benefit and be used by TUFCO's sister company, Texas Utilities Electric Company ("TU Electric"). TUFCO sued on the contract, claiming Marathon breached. The trial court granted summary judgment for Marathon on the ground that TUFCO suffered no damages because TUFCO was reimbursed by TU Electric for its costs in supplying gas to TU Electric. *Id*. at *9. Marathon argued that TU Electric was never mentioned in the pleadings, and that "the pleadings seek only damages

---

[10] We are treating the cited Restatement section and comment as persuasive authority rather than controlling authority. Tex. Civ. Prac. & Rem. Code § 5.001(b).

[11] *See* Tex. R. App. P. 47.7(b).

claimed to have been suffered directly by TUFCO, not TU Electric." *Id.* The court of appeals reversed the summary judgment. The court noted that although TUFCO sued in its own name, the record showed it was acting as the agent of TU Electric. *Id.* "At the very least," the court said, "this summary judgment evidence creates a fact issue as to whether TUFCO purchased gas under the contract as TU Electric's agent." *Id.* The court held that if TUFCO purchased the gas as an agent for TU Electric, TUFCO could still bring the lawsuit because "an agent who is a party promisee on a contract made by him on behalf of his principal may bring suit on that contract in his own name." *Id.* (citing *Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc.*, 630 F.2d 250, 258 (5th Cir. 1980)). We conclude that Chemical may sue on Vinyls's behalf to recover contract damages even though Vinyls alone incurred them.

Appellants neither present contrary authority nor dispute the legal effect of the jury's agency findings. They characterize the agency findings as irrelevant, but we disagree. Chemical's status as Vinyls's agent, coupled with Chemical's signing of the construction contract in its own name, means that Chemical is a party to the contract; that Vinyls is a party to the contract;[12] that Chemical is entitled to sue on the contract in Vinyls's name, in Chemical's name, or both; and that Chemical may recover in its own name Vinyls's damages.[13] We have not located and the parties have not cited a case involving this issue that proceeded to jury verdict, so we have no guide against which to compare the present charge instructions when an agent sues to recover damages incurred only by the principal. But no party claims the

---

[12] *Latch v. Gratty*, 107 S.W.3d 543, 546 (Tex. 2003) (citing Restatement (Second) of Agency § 186 cmt. c ("The principal becomes a party to the transaction only if it is proved that the agent intended to act upon his account.")); *see also* Restatement (Third) of Agency § 6.01 (disclosed principal is party to contract signed by principal's agent with authority).

[13] *See* Restatement (Second) of Agency § 364 cmt. k; *Tex. Utils. Fuel Co.*, 2000 WL 34234653, at *9.

instruction accompanying question 3D is defective in wording, and it contains language consistent with the effect of the jury's agency findings in questions 1A and 1B. Based on those findings, Vinyls and Chemical are considered one and the same at least for the purpose of enforcing the contract rights at issue. *See Holloway*, 898 S.W.2d at 795.[14] If Chemical can sue in its own name to recover Vinyls's damages, then it is entitled to a jury question in its own name to secure a judgment in its own name. Otherwise, there would be little point to recognizing a contracting agent's right to sue in its own name to recover the principal's contract damages. Chemical recovers as Vinyls's fiduciary[15] or trustee,[16] and thus the recovery is rightfully Vinyls's—a result not materially different than if question 3D had referred to costs "incurred by Westlake Vinyls" instead of "incurred by Westlake Chemical."

For these reasons, we overrule appellants' legal-sufficiency challenge to the jury's finding in response to question 3D.

3.    *Challenge to findings that Chemical substantially complied with notice conditions*

In the next part of their first issue, appellants contend that Chemical may not recover under paragraph 21.3 because it failed to strictly comply with that paragraph's notice provisions, which they claim are conditions precedent to recovery

---

[14] The jury heard Byrd explain that he did not distinguish between Vinyls and Chemical but considered them both as one entity, "Westlake." Had the jury answered "no" to questions 1A and 1B, we would agree that appellants should prevail on their first issue because the instruction submitted with question 3D referred only to whether Chemical, not Vinyls, incurred damages. That Chemical incurred no damages generally would be fatal to recovery on this charge, but it is not so here because Chemical secured agency findings, which allow Chemical to recover Vinyls's contract damages in Chemical's name.

[15] *Johnson*, 73 S.W.3d at 200; *see Robles*, 965 S.W.2d at 558 n.4.

[16] *See Small v. Ciao Stables, Inc.*, 289 Md. 554, 568, 425 A.2d 1030, 1038 (1981) ("The agent who is authorized to sue in his own name on behalf of his principal 'recovers as trustee for his principal.'" (quoting *U.S. Telegraph Co. v. Gildersleve*, 29 Md. 232, 245, 246 (1868))).

for breach. Alternatively, appellants argue that to the extent Chemical may satisfy paragraph 21.3's notice requirements by substantial compliance, the evidence is legally insufficient to support the jury's findings that Chemical substantially complied.[17]

<b>a.    Strict compliance versus substantial compliance</b>

In questions 3A, 3B, and 3C, the jury found that Chemical substantially complied with each of the three notice provisions referenced in paragraph 21.3.[18] The jury instruction regarding substantial compliance was the same in each question, though tailored to the substance of each relevant notice:

> Answer "Yes" or "No" as to each of the following grounds on which you may find that Westlake Chemical provided notice regarding this notice provision of Section 21.3 of the Construction Contract:
>
> . . .

---

[17] Appellants also contend that the jury questions on substantial compliance are unsupported by Chemical's pleading. Chemical pleaded that all conditions precedent to recovery had occurred or been performed. Appellants specifically denied this allegation, thus placing on Chemical the burden to prove that the conditions put into issue by appellants' denial had in fact occurred. *See U.S. Tire-Tech, Inc. v. Boeran, B.V.*, 110 S.W.3d 194, 200 (Tex. App.—Houston [1st Dist.] 2003, pet. denied) (when defendant specifically denied condition precedent of notice, plaintiff required to prove notice at trial). Substantial compliance with a contract requirement is the legal equivalent of full compliance. *Telles v. Vasconcelos*, 417 S.W.2d 491, 494 (Tex. App.— El Paso 1967, writ ref'd n.r.e.). As this court and others have stated, a party's averment that all conditions precedent have occurred or have been performed will support the submission of a question or instruction on substantial performance. *Geotech Energy Corp. v. Gulf States Telecomms. & Info. Sys., Inc.*, 788 S.W.2d 386, 390 (Tex. App.—Houston [14th Dist.] 1990, no writ); *Zion Missionary Baptist Church v. Pearson*, 695 S.W.2d 609, 611 (Tex. App.—Dallas 1985, writ ref'd n.r.e.); *Del Monte Corp. v. Martin*, 574 S.W.2d 597, 599 (Tex. App.—San Antonio 1978, no writ). We therefore reject appellants' argument that the jury submissions regarding substantial compliance are not supported by Chemical's petition.

[18] The jury also found that Chemical did not strictly comply with the first two notice provisions, and that strict compliance with those provisions would not have been futile. Chemical does not challenge these findings. The jury was not asked whether Chemical strictly complied with the third notice provision.

Westlake Chemical notified James in "substantial compliance" with this notice provision?

You are instructed that Westlake Chemical notified James in "substantial compliance" with this notice provision if all of the following circumstances occurred:

- James received actual notice from Westlake Chemical that

  [Question 3A] Westlake Chemical had discovered or determined, in its reasonable opinion, that James had serious safety violations

  [Question 3B] Westlake Chemical was not reasonably satisfied with the pace and the quality of the remediation effort

  [Question 3C] Westlake Chemical had elected in its sole discretion to terminate the Construction Contract or a portion of the Work, and

- the form of actual notice to James did not severely impair the purpose of this notice provision and caused no harm to James.

Answer "Yes" or "No."

Answer: ___Yes___

Appellants contend that Texas law mandates strict compliance with notice provisions in construction contracts. This contract requires notices to be written.[19]

---

[19] Paragraph 9.1 provides:

Notices. Any notice, approval or other communication given pursuant to this Contract *shall be in writing* and shall be deemed duly served and given (i) when received after being delivered by hand or overnight delivery service, (ii) when telecopied, with confirmation of receipt, to the facsimile number shown below, (iii) upon receipt when sent by certified or registered mail (return receipt requested), or (iv) by electronic mail to the Parties at their addresses as follows: [spaces for names, phone numbers, fax numbers, and email addresses are left blank] (emphasis added).

Because no notices were communicated in writing, appellants argue that Chemical did not strictly comply with the notice conditions, and consequently appellants cannot be liable for breach. Appellants do not contend that Chemical failed to strictly comply in any other respect. According to appellants, the jury's substantial compliance findings are therefore immaterial. Appellants cite this court's decisions in *Arbor Windsor Court, Ltd. v. Weekley Homes, LP*, 463 S.W.3d 131, 136-41 (Tex. App.—Houston [14th Dist.] 2015, pet. denied); *Cajun Constructors, Inc. v. Velasco Drainage District*, 380 S.W.3d 819, 825-26 (Tex. App.—Houston [14th Dist.] 2012, pet. denied); and *Emerald Forest Utility District v. Simonsen Construction Co.*, 679 S.W.2d 51, 54 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.). Appellants also cite *Ogden v. Gibraltar Savings Association*, 640 S.W.2d 232, 233-34 (Tex. 1982), and *Shumway v. Horizon Credit Corp.*, 801 S.W.2d 890, 893 (Tex. 1991), in support of the proposition that Texas courts consistently require strict compliance with written-notice requirements attendant to contractual forfeiture and termination provisions.

In turn, Chemical insists that Texas law recognizes the doctrine of substantial compliance with respect to contractual notice provisions. Chemical cites three Dallas Court of Appeals opinions—*Burlington Northern Railroad Co. v. General Projection Systems, Inc.*, No. 05-97-00425-CV, 2000 WL 1100874, at *5 (Tex. App.—Dallas Aug. 8, 2000, pet. denied) (not designated for publication); *Texas Utilities Electric Co. v. Aetna Casualty & Surety Co.*, 786 S.W.2d 792, 793-94 (Tex. App.—Dallas 1990, writ denied); *Barbier v. Barry*, 345 S.W.2d 557, 562 (Tex. App.—Dallas 1961, no writ)—and the Fifth Circuit's decision in *South Texas Electric Co-op. v. Dresser-Rand Co.*, 575 F.3d 504, 507 (5th Cir. 2009).

All parties agree that paragraph 21.3's notice provisions are conditions, not covenants.[20] Paragraph 21.3 imposes two potential duties on James but only if certain events occur. The first duty is to begin remedying safety violations. If Chemical desired to trigger James's remediation duty, the triggering conditions are that Chemical must have first discovered or determined in its reasonable opinion that James has serious safety violations, and it must have so notified James. James is then required to begin remediation of the defects cited within seventy-two hours after receiving Chemical's notice. The second potential duty is to pay for post-termination costs above the contract price. That duty is triggered if: (1) Chemical is not reasonably satisfied with the pace and quality of the remediation; (2) Chemical notifies James of its dissatisfaction; and (3) Chemical notifies James that it elects to terminate the contract or a portion of the work. The question we must decide is whether James's duties to begin remediation and then pay for post-termination costs above the contract price are invoked if Chemical did not strictly comply with the conditions by providing notices in writing, as paragraph 9.1 requires, but instead substantially complied because James received non-written notice, the form of which did not severely impair the provision's purpose and caused James no harm.

---

[20] "A condition precedent may be either a condition to the formation of a contract or to an obligation to perform an existing agreement." *Hohenberg Bros. Co. v. George E. Gibbons & Co.*, 537 S.W.2d 1, 3 (Tex. 1976). A condition precedent to an obligation to perform is an act or event that "must occur before there is a right to immediate performance and before there is a breach of contractual duty." *Id.*; *see Solar Applications Eng'g, Inc. v. T.A. Oper. Corp.*, 327 S.W.3d 104, 108 (Tex. 2010). Stated differently, "a 'triggering' condition or event is one that brings something else into effect." *Greene v. Farmers Ins. Exch.*, 446 S.W.3d 761, 765 (Tex. 2014). A covenant, as distinguished from a condition, is an agreement to act or refrain from acting in a certain way. *Solar Applications*, 327 S.W.3d at 108. "In short, when a party fails to fulfill a condition precedent to another party's obligation, the other party has no duty under the contract to perform that obligation, regardless of whether the contract has been breached." *Greene*, 446 S.W.3d at 782 n.25 (Tex. 2014) (Boyd, J., concurring); *see* Restatement (Second) of Contracts § 225(1), (2).

The Supreme Court of Texas has considered whether a failure to comply with certain notice conditions precedent excuses the other party's performance or precludes liability for failure to perform. Most recently, the issue has arisen in the insurance context. *E.g.*, *Prodigy Commc'ns Corp. v. Agric. Excess & Surplus Ins. Co.*, 288 S.W.3d 374 (Tex. 2009); *PAJ, Inc. v. Hanover Ins. Co.*, 243 S.W.3d 630 (Tex. 2008). In *PAJ*, the court considered the effect on commercial general liability coverage when an insured fails to timely notify the insurer of a claim but the insurer suffers no harm. *PAJ*, 243 S.W.3d at 632. The court held that a failure to comply with a timely-notice provision does not excuse the insurer's performance if the insurer is not prejudiced by the delay. *Id*. at 636-37. The ruling rested in large part on fundamental contract law that material breaches excuse the other party's performance, but immaterial breaches do not. *Id*. at 633. In that case, the parties disputed whether the notice provisions were conditions precedent or covenants, but the court applied basic contract law of immateriality regardless of the character of the provision. *Id*. at 636-37. Additionally, the court noted that the timely-notice provisions were not essential to the overall bargain, and that excusing performance altogether for *de minimus* deviations from notice requirements would be "draconian." *Id*. at 636.

In *Prodigy*, the court considered whether *PAJ*'s holding would apply to a claims-made (as distinguished from an occurrence-based) insurance policy containing an "as soon as practicable" timely-notice provision. *Prodigy*, 288 S.W.3d at 375. There the policy required that the insured give notice of a claim "as soon as practicable . . ., but in no event later than ninety (90) days after the expiration of the Policy Period or Discovery Period." *Id*. at 378. The contract clearly described the notice provision and reporting period provision as conditions precedent. *Id*. The parties disputed whether notice of the claim was given "as soon as practicable," but

22

the insurer admitted it suffered no prejudice. The court held that *PAJ*'s "notice-prejudice" rule also applied to the "as soon as practicable" notice provision in the claims-made policy at issue in *Prodigy*. *Id*. at 382. The principal reason for the court's holding was because the "as soon as practicable" notice clause was not essential to the bargain in that case. *Id*. Thus, the insured's failure to comply with the timely-notice condition did not excuse the insurer's performance. *Id*.

In another insurance dispute pre-dating *PAJ* and *Prodigy*, the supreme court addressed an insured's failure to comply with proof-of-loss conditions precedent in a policy providing disability benefits. *See Am. Teachers Life Ins. Co. v. Brugette*, 728 S.W.2d 763 (Tex. 1987). There the insured raised theories that he substantially complied with the conditions, or the insurer waived them. *Id*. at 764. The court held that it was the insured's burden to secure jury findings on substantial compliance, absent conclusive evidence in his favor, and because he failed to do so he was not entitled to prevail. *Id*. *Brugette* recognizes that an insured may satisfy a proof-of-loss condition precedent by establishing he substantially complied with the condition. *Id*.

From these informative examples, we learn, in the insurance context at least, that a party will not lose the benefit of its bargain for immaterial or non-prejudicial non-compliance with timely-notice provisions, *see PAJ*, 243 S.W.3d at 636-37, including when those notice provisions are conditions precedent. *See Prodigy*, 288 S.W.3d at 382. Under *Prodigy*'s reasoning, when a triggering condition is not essential to the overall bargain, a party's failure to fully satisfy that condition does not necessarily excuse the other's party's obligation that would be triggered by the condition's occurrence. *See id*. This reasoning is consistent with other statements of a similar principle grounded in the Restatement: the non-performance of a condition precedent is excused if the condition's requirement "(a) will involve

extreme forfeiture or penalty, and (b) its existence or occurrence forms no essential part of the exchange for the promisor's performance." *Lesikar Constr. Co. v. Acoustex, Inc.*, 509 S.W.2d 877, 881 (Tex. App.—Fort Worth 1974, writ ref'd n.r.e.) (citing Restatement (First) of Contracts § 302). *Brugette* clearly acknowledges an insured's right to recover on an insurance policy if the insured substantially complies with a proof-of-loss condition precedent.

The supreme court also has considered the issue in the construction context, though not recently. Over a century ago, the high court upheld a contractor's recovery for breach of contract despite the contractor's failure to strictly comply with a contract condition requiring it to produce an architect's certification that work performed complied with specifications. *See Linch v. Paris Lumber & Grain Elev. Co.*, 80 Tex. 23, 15 S.W. 208 (1891). In *Linch*, the contractor allegedly completed the first stage of construction but the owner refused full payment, contending that the work and materials did not strictly comply with the contract. The contractor sued for breach though it had not complied with the condition that it first secure an architect's certification.[21] The jury found for the contractor and the trial court rendered judgment in its favor. *Id.* The owner complained on appeal about jury-charge instructions that permitted recovery upon substantial compliance with the contract's terms. In particular, the owner argued that the contractor was not entitled to recover because the certificate condition had not been satisfied. *Id.* at 213. The court rejected the argument and concluded that less than strict compliance with the

---

[21] The contract provided that "no claim shall be made or suit brought for any sum due, or claimed to be due for said improvement, unless upon certificate of said superintendent or inspector that the improvement has been made in strict accordance with the contract and plans and specifications, or such alterations as may have been made therein in accordance with the stipulations of this contract." *Id.* at 208. The court viewed this provision as a condition, *id.* at 213, and it contains the sort of conditional language typically signifying a condition precedent. *See Solar Applications*, 327 S.W.3d at 109.

certificate condition did not defeat the contractor's right of recovery. *Id*. Not long after *Linch*, the supreme court stated in *Perkins v. Locke*, 88 Tex. 66, 29 S.W. 1048 (1895), that substantial compliance with a contract's certificate provision would suffice, though in *Perkins* the certificate did not substantially comply with the contract. *Id*. at 1050.

Appellants cite the supreme court's decisions in *Ogden* and *Shumway* as supporting their contention that parties must strictly comply with written notice requirements attendant to contractual termination provisions. But *Ogden* and *Shumway* discussed and applied equity and Uniform Commercial Code (UCC) rules uniquely applicable to acceleration and notice-of-acceleration provisions in promissory notes. *Shumway*, 801 S.W.2d at 893-94; *Ogden*, 640 S.W.2d at 234-35. In *Ogden*, the court held that the note holder's letter "gave no clear and unequivocal notice" that it would exercise its option to accelerate the note. *Ogden*, 640 S.W.2d at 234. Thus, the notice of acceleration was insufficient and the maker could recover for wrongful foreclosure. Later, in *Shumway*, the court held that promissory note makers can waive presentment, notice of intent to accelerate, and notice of acceleration, which, to be effective, also must be expressed in clear and unequivocal language. *Shumway*, 801 S.W.2d at 893. But the court later clarified *Ogden* in *Jasper Federal Savings & Loan Association v. Reddell*, 730 S.W.2d 672 (Tex. 1987), in which the court held, in a deed-of-trust dispute, that actual knowledge of the right to reinstate after acceleration was sufficient despite a notice provision in the deed. *Id*. at 675. In distinguishing *Ogden*, the court in *Jasper* observed that the bank never contended that Ogden had actual knowledge of its intent to accelerate. *Id*. *Jasper* also relied on the court's decision in *University Savings Association v. Springwoods Shopping Center*, 644 S.W.2d 705 (Tex. 1982), upholding a foreclosure sale in which there had been no compliance with provisions relating to the recording of the

appointment of the substitute trustee before sale.  *See Jasper*, 730 S.W.2d at 675. The court held the borrower's actions for wrongful foreclosure were barred by his actual notice of the substitution and identity of the substitute trustee, and the time and place of the sale, when no prejudice resulted from the failure to comply with the recordation provision in the deed of trust.  *Id.* (citing *Univ. Savings*, 644 S.W.2d at 705).

In addition to the above authority, several Texas intermediate appellate courts have held, stated, or assumed that the substantial compliance doctrine applies to contract conditions precedent, including those containing notice provisions.  In a notably comparable context, the Eastland Court of Appeals applied the substantial compliance doctrine to cancellation notice provisions in a construction contract and held that the terminating party substantially complied with the notice provision even though the notice was untimely.  *S. Mortg. Co. v. McGregor*, 279 S.W. 860, 861 (Tex. App.—Eastland 1926), *aff'd*, 286 S.W. 1086 (Tex. Comm'n App. 1926, judgm't adopted).  Additionally and outside the construction context, the Dallas Court of Appeals has applied the substantial compliance doctrine to cancellation notice provisions in a contract to install audiovisual equipment,[22] a licensing agreement,[23] a contract to supply electrical power to a commercial business,[24] and an employment contract.[25]  Our court and the San Antonio Court of Appeals have

---

[22] *Burlington N. R.R. Co.*, 2000 WL 1100874, at *5.

[23] *Barbier*, 345 S.W.2d at 562 (citing *S. Mortg.*, 279 S.W. at 860).  In *Barbier*, the court held that the party's failure to send the notice by registered mail did not destroy its effectiveness as notice.  *Id*.

[24] *Tex. Util. Elec. Co. v. Aetna Cas. & Surety Co*., 786 S.W.2d 792, 793-94 (Tex. App.—Dallas 1990, writ denied) (notice sent to and received at office location other than office location specified by contract substantially complied with contract terms).

[25] *Parking Co. of Am. v. Wilson*, No. 05-99-00404-CV, 2002 WL 387180, at *3, (Tex. App.—Dallas Mar. 13, 2002, no pet.) (not designated for publication).  In *Wilson*, the contract at issue required termination on thirty days' written notice.  The employee gave notice verbally.  *Id*. The court assumed that substantial compliance would suffice and further assumed that verbal

explicitly or implicitly applied the substantial compliance doctrine to notice provisions in lease agreements and in other contexts.[26]

Appellants cite Texas intermediate appellate court decisions that are less clear, relying heavily on this court's opinion in *Emerald Forest*. 679 S.W.2d at 51. There, Emerald Forest Utility District sued an engineer and construction company after an underground sewer system built by the construction company failed. *Id.* The jury found that the line failed because the engineer's design was insufficient to deal with underground wet sand conditions discovered during construction. *Id.* at 52. The jury also found that the utility district failed to provide sufficient plans to the construction company. *Id.* We reversed and held that the construction company was liable for breach of its promise to deliver a working sewer system because the company was in a position to discover the insufficient soil conditions before it executed the contract, and it agreed to investigate and apply its independent judgment concerning worksite conditions. *Id.* at 53. The company argued that it could not be liable on that ground because it notified the engineer and utility district of the wet sand conditions and requested a substitute design. *Id.* at 54. This court said that the construction company could not avoid contract liability because the record did not show that the company gave written notice of the subsurface

---

notice would be sufficient to substantially comply with the contract's written notice provision, but held nonetheless that substantial compliance was not shown on that record. *Id.*

[26] *MMM 410 Bar & Grill, LLC v. Fong*, No. 04-18-00156-CV, 2018 WL 5018767, at *3 (Tex. App.—San Antonio Oct. 17, 2018, no pet.) (mem. op.); *Am. Props. of Houston, LLC v. Detering Office Partners, Ltd.*, No. 14-10-00063-CV, 2011 WL 529711, at *3 (Tex. App.—Houston [14th Dist.] Feb. 15, 2011, no pet.) (mem. op.) (holding actual notice of landlord's intent to repair the leased premises rendered the written notice requirement in the lease unnecessary); *see also Comeaux v. Suderman*, 93 S.W.3d 215, 219 (Tex. App.—Houston [14th Dist.] 2002, no pet.) (considering right of first refusal in option contract, stating party's actual notice of proposed sale of premises and opportunity to purchase it rendered unnecessary for court to address whether notice was "technically insufficient").

conditions varying from the original specifications, as the contract required.[27]  *Id.* As we stated, "[w]hen a contract provides for a particular form of notice, compliance with such provisions is a condition precedent to invoking the contract rights which are conditioned on the notice."  *Id.* (citing *Handelman v. Handelman*, 608 S.W.2d 298 (Tex. App.—Houston [14th Dist.] 1980, writ ref'd n.r.e.)).  We did not, however, discuss or mention the doctrine of substantial compliance as applied to the contract conditions, and it does not appear the construction company raised the issue. We will not construe *Emerald Forest* as holding that substantial compliance never applies to notice conditions precedent when it is not clear that the issue was raised, considered, and expressly rejected by our court in that case.

We also disagree with appellants that our decisions in *Arbor Windsor* and *Cajun Constructors* compel us to deny Chemical's recovery absent strict compliance with the contract's notice provisions.  In *Arbor Windsor*, we stated that Arbor Windsor had the burden to prove that it was excused from sending a notice of default to Weekley as a condition precedent to its right to invoke contractual remedies for default, and also had the burden to obtain a jury finding of excuse.  *Arbor Windsor*, 463 S.W.3d at 142.  Arbor Windsor neither obtained a jury finding that it was excused nor argued that it conclusively established it was excused from sending notice of default.  *Id*.  Here, in contrast, Chemical secured findings that it substantially complied with the notice provision.  Indeed, by observing that Arbor Windsor could have proven it was excused from complying with the notice provision there at issue, our court necessarily recognized that a failure to strictly comply with the notice condition precedent would not always foreclose recovery, just that Arbor Windsor had not made the necessary showing in that case.  In *Cajun Constructors*,

---

[27] The contract stated:  "[t]he CONTRACTOR will promptly notify the OWNER and ENGINEER *in writing* of any subsurface or latent physical conditions at the site differing materially from those indicated in the Contract Documents. . . ."  *Id*. (emphasis added).

28

we affirmed a summary judgment against a party seeking recovery for breach of contract because the plaintiff did not present evidence that it complied with the contract's notice requirements, which we held to be conditions precedent to bringing suit. *Cajun Constructors*, 380 S.W.3d at 825-26. As in *Emerald Forest*, however, the parties in *Cajun Constructors* did not raise the issue of substantial compliance and the court did not discuss it.

We are not bound by the Fifth Circuit's interpretation of state law, but we note that court has characterized as "well-established Texas law" the "applicability of the doctrine of substantial compliance to contractual notice provisions." *S. Tex. Elec. Co-op.*, 575 F.3d at 507 (citing *Barbier*, 345 S.W.2d at 562, and *Tex. Utilities Elec. Co.*, 786 S.W.2d at 794). No Texas state case is more factually on point than *South Texas*. In that case, which involved manufacture of a turbine, Dresser, like James, was required to correct defects after receiving written notice. *Id*. at 506. Despite many problems, and Dresser's awareness of them, Dresser did little to remedy the issues. South Texas employed others to perform repairs without providing Dresser written notice. *Id*. South Texas sued for its repair costs; the jury found Dresser was liable for breach, and that South Texas substantially complied with the notice provision. *Id*. On appeal, Dresser, again like James, argued that the court erred in submitting the substantial compliance issue to the jury because Texas law required strict compliance with the notice provision. *Id*. at 507. The Fifth Circuit disagreed and reasoned that the notice provision's purpose was served by Dresser's actual knowledge of the problems and was not impaired by South Texas's failure to strictly comply. *See id*. at 508-09.

In light of the above authority, we reject appellants' argument that Texas law categorically requires strict compliance with written notice conditions precedent in construction contracts. We hold that Chemical's failure to strictly comply with the

29

written notice provisions required by paragraphs 9.1 and 21.3 does not compel reversal, and that Chemical's substantial compliance suffices to support recovery if the evidence shows that James received actual notice, and that the form of the notice did not severely impair the notice provision's purpose and caused James no harm. We turn to whether the evidence in fact supports these findings.[28]

                b.      Legal sufficiency challenge to the jury's substantial compliance findings

Appellants contend that no legally sufficient evidence supports the jury's substantial compliance findings in questions 3A, 3B, and 3C, and that those findings lack support because Chemical's notices of default and termination were not clear and unequivocal. As to questions 3A and 3B, appellants argue more particularly that Chemical's communications were insufficiently specific to constitute actual notice of any of the mentioned events. Appellants say there was no specific mention of any safety violations or that Chemical was unsatisfied with the pace or quality of James's remedial efforts. Also, James could not determine from the communications when the seventy-two-hour period to institute remedial measures began after the first notice. Regarding question 3C, appellants argue that an April 2013 meeting about James's deficient safety performance was vague, and that Chemical never actually informed James that it was being "terminated" for "default."

This issue requires us to examine whether the evidence supports the jury's findings. As stated, we view the evidence in the light most favorable to the judgment and indulge every reasonable inference that would support it. *City of Keller*, 168 S.W.3d at 822. We credit favorable evidence if a reasonable fact finder could and disregard contrary evidence unless a reasonable fact finder could not. *Id*. at 807,

---

[28] As no party complains of the language used in the instructions, we apply them as written and express no opinion whether they accurately or completely state Texas law.

827. If more than a scintilla of evidence supports the judgment, we must uphold it. *Coffman*, 448 S.W.3d at 71. More than a scintilla of evidence exists when the evidence supporting the finding rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Id*.

First Notice

In question 3A, the jury found that Chemical provided notice to James that Chemical had discovered or determined, in its reasonable opinion, that James had serious safety violations, in that: (1) James received actual notice of that fact from Chemical; and (2) the form of actual notice did not severely impair the notice provision's purpose and caused James no harm.

James was responsible for performing its work safely. However, during the project, James incurred multiple OSHA-recordable safety incidents, as well as numerous documented "near miss" incidents. For example, on September 25, 2012, one of James's workers broke his leg while on the jobsite. A root cause of this incident involved lack of communication between an operator and a flagger. Several other near-miss incidents occurred that also could be attributed to James's failure to have appropriate flagging or spotting personnel.

Three months after the worker injured his leg, another significant safety incident resulted in a fatality. In December 2012, one of James's employees, Gregory Price, sustained a head injury from a fall on the job and later died. OSHA cited James for a "serious" safety violation for this fatality, which resulted from a lack of appropriate flagging personnel.

Immediately following the Price incident, Chemical's project manager, Abram Kuo, expressed Chemical's displeasure over James's safety performance to James's site manager, Rusty DeBarge. Kuo copied DeBarge on an email in which

31

Kuo explained that the parties needed "to develop [a] preventive safety mind set with some extraordinary measure[s] on job safety." Further, Kuo stated in the email that he would be on site January 2, 2013, to review the "safety performance and counter measures for safety prevention," and that James's management had been asked to attend that meeting. In a prior email in the chain on which DeBarge was copied, Kenner stated: "James Construction needs to show us how they will really prevent this and other types of incidents. [The Price fatality] was completely preventable." In a separate email between Kuo and Kenner, Kuo confirmed that he had spoken with DeBarge and "expressed our displeasure over the incidents and safety performance of James." According to Kuo, at the January 2 meeting, site teams from both James and Chemical sat down and discussed the safety incidents that had occurred, including the Price fatality, and Chemical stressed "how important [it was] to have [James] improve [its] safety performance on the job." After that meeting, Chemical's technology manager, Scott Campbell, met with DeBarge and asked James to document its safety procedures before and after the fatality, and told James that "we wanted to see their program improve greatly." Chemical's project team met and discussed how they could help James improve its safety performance. The team discussed whether the project was "too big for James" and talked about carving out portions of the work to help James improve its safety performance.

In response to James's actual knowledge that Chemical determined it had serious safety violations, James in fact began remedial measures, thus demonstrating that this knowledge satisfied the notice provision's purpose. On January 9, DeBarge sent Chemical an email summarizing some of the post-accident measures implemented.[29] DeBarge also stated subsequently in another email that because of

---

[29] Appellants began remedial measures, and Chemical raised no complaint about their timeliness. Thus, it is immaterial whether James knew when its seventy-two-hour window commenced.

32

the Price fatality, James "would never consider ourselves successful in a general sense of safety on this project."

We conclude the above evidence is more than a scintilla that: (1) James received actual notice from Chemical that Chemical had discovered or determined, in its reasonable opinion, that James had serious safety violations; and (2) the form of actual notice (email and oral) did not severely impair the notice provision's purpose and caused James no harm. We overrule appellants' legal-sufficiency challenge to question 3A.

Second and Third Notices

In questions 3B and 3C, the jury found that Chemical provided notice to James that Chemical was not reasonably satisfied with the pace and the quality of the remediation effort, and that Chemical had elected to terminate the construction contract or a portion of the work, in that: (1) James received actual notice of those facts from Chemical; and (2) the form of actual notice did not severely impair the notice provision's purpose and caused James no harm.

James discovered that Chemical was considering making changes in the project going forward. Chemical had reached out to another construction company, Turner Industries, to discuss engaging Turner to work on the project. In response to this discovery, DeBarge emailed Kuo on January 18 regarding James's ongoing safety improvement efforts. The content of this email both confirms James's remediation efforts and shows that James was contemplating the possibility that it could be removed from the job or portions of its work could be re-assigned. Kuo responded to DeBarge's email and confirmed that Chemical was considering transferring to Turner "independent jobs" such as ethylene dichloride distillation and pipeline work. In this email, Kuo explained that Chemical's intent was to ensure success on the overall chlor-alkali project. Kuo emphasized that Chemical and

33

James had the responsibility to take "proactive action(s) deem[ed] necessary" to prevent any further safety incidents. On January 30, Vinyls entered into a general construction contract with Turner to take over ethylene dichloride distillation and pipeline work from James. Chemical re-assigned this work to reduce the load on James with the hope that James's safety performance would improve.

In late February, DeBarge sent an internal email to another James representative proposing, among other things, options for James to respond to "the situation." Aware of the probability that James would lose further work to Turner, he suggested that James either accept a modified work scope as Chemical chose or take a firm stance and insist that Chemical quit holding issues like safety "over our heads."

According to Kuo, James's safety record improved in January 2013, but by February safety incidents had ratcheted up. Campbell also testified about James's typical response to safety incidents:

> After there would be an OSHA recordable there would be two weeks of really good performance, maybe a third week where there would be a little something. And then things start falling off again after three or four weeks, and we'd go back to Rusty [DeBarge] and try to get them back on track.

Because James's safety incidents continued after January and Chemical thought DeBarge had a "deaf ear" on safety concerns, Campbell and several other Chemical employees met with James's vice president, Conrad Bourg, and asked Bourg to remove DeBarge. James replaced DeBarge with Mark Lammon in February. Yet, internal emails between Chemical employees show that Chemical remained concerned about James's safety performance. For example, in a March 6, 2013 email, Kenner instructed Kuo to let James know that Chemical was considering removing it from the job and putting it "on notice." Additionally, internal

34

communications among James personnel show that James was aware of Chemical's continued concerns with safety performance and intended to review its steps to improve its safety and productivity.

Accidents continued to occur despite James's downsized scope of work. An accident on April 1 resulted in a worker's broken finger. On April 8, James's workers damaged scaffolding over a chlorine line by striking it with a track hoe. According to Campbell, damage to the chlorine line could have been life-threatening to people in the area. The root cause of this near-miss incident was identified as a failure to effectively use spotting/flagging processes. Chemical then decided to remove all mechanical scope of work from James. Kuo told Campbell to meet with Turner immediately about its availability to assume James's remaining mechanical work.

Campbell scheduled an April 11 meeting with other Chemical and James personnel. During the meeting, Campbell told James's representatives Lammon and Bourg that James's safety record was "deplorable" or "terrible." Campbell reiterated that despite Chemical's attempts to help James improve its safety performance, and despite James's replacement of its project manager, James was "falling back into the same pattern." Campbell informed them that James had five days to get its "remaining piping and mechanical people off the job." Campbell explained that James would no longer be performing mechanical construction for the project because of James's poor safety performance. According to Campbell, Bourg responded with incredulity, exclaiming "everyone has fatalities." Later that day, James terminated its subcontracts effective April 14. On May 8, DeBarge sent a letter to Chemical confirming that James had "discontinued mechanical work on the Chlor-Alkali project and we have completed the demobilization of the mechanical

35

forces." James continued the civil construction portion of the job until it was completed, and Chemical paid James for its work on the project, including retainage.

Citing *Vinson Minerals, Ltd. v. XTO Energy, Inc.*, 335 S.W.3d 344, 356-58 (Tex. App.—Fort Worth 2010, pet. denied), appellants say Chemical's communications during the April 11 meeting were too vague and equivocal to constitute proper notice of termination. *Vinson* in some respects supports appellants' position that notice of termination must be clear and unequivocal, but *Vinson* does not say that only *written* notices can be clear and unequivocal. A reasonable juror could have found that Chemical's statements during the meeting clearly informed James of its termination, and that James received the message. Otherwise, James would not have cancelled its subcontracts immediately or sent a letter to Chemical confirming its terminated scope of work.

We conclude the above evidence is more than a scintilla that: (1) Chemical provided notice to James that Chemical was not reasonably satisfied with the pace and the quality of the remediation effort; (2) Chemical had elected to terminate the construction contract or a portion of the work; (3) James received actual notice of those facts from Chemical; and (4) the form of actual notice did not severely impair the notice provision's purpose and caused James no harm. We overrule appellants' legal-sufficiency challenge to questions 3B and 3C.

4.    *Legal sufficiency challenge to damages*

Next, appellants challenge the legal sufficiency of the evidence to support the jury's damages awards of $211,836.81 in safety training costs and $842,415 in increased foreman costs. In connection with the damages question, the trial court instructed the jury:

To consider only the following elements of damage:

36

Any extra costs in excess of the Contract Price incurred by Westlake Chemical in regards to taking possession of the Work or the portion thereof terminated and purchasing and/or hiring materials, tools, supervision, labor, and equipment for the completion of the Work.

If you answered "Yes" to Questions 1A or 1B, then you may include Westlake Vinyls' damages, if any, in your answers below, otherwise, do not include Westlake Vinyls' damages, if any, in your answers below.

Appellants contend there is no evidence to support a finding in regard to either the "contract price" or the "extra costs in excess of the contract price." We disagree.

First, the contract does not define "Contract Price" as a fixed sum but rather as "the total compensation payable to the Contractor for the performance of the Work." In turn, "Work" is defined as "certain services and/or equipment, materials, supplies, or other products." The damages categories the jury awarded—"Safety Training Costs" and "Increased Foreman Costs"—were costs that were incurred *only* because of the transition from James to Turner, as explained by Chemical's damages expert, Byrd. For example, Byrd testified that he "identified the extra piece of the cost that [was] uniquely caused by the removal and replacement of James." Byrd also established that the damages incurred were associated with work scope that originally had been assigned to James but was reassigned to Turner after Chemical terminated James's mechanical scope.[30]

Turning to the specific categories of damages awarded, Byrd explained regarding the safety training costs:

When James was on the project, James had a peak labor force of 732 workers. So when Westlake had to replace James with Turner, they had

---

[30] For example, Byrd explained, "Westlake actually removed work scope from James that was ongoing and active, at various states of progress throughout the entire facility, which was a massive scope removal, and then transferred that scope to Turner to complete."

> to pay Turner to reorient, basically, incur these *costs uniquely as a result of the removal and replacement of [James]*, but only as to the 732 people that had already been on site before.

(Emphasis added). Accordingly, Byrd limited his damages calculation only to those 732 workers, explaining that any workers provided by Turner in excess of that number were not part of his calculation because, had James hired additional workers, "those costs would have been incurred anyway." Byrd testified that the total additional costs for safety training "attributable to Westlake Chemical's removal of James'[s] mechanical scope" was $506,747. The jury's $211,836.81 award for this damages category was well within the range to which Byrd testified. *See, e.g.*, *Gulf States Utils. Co. v. Low*, 79 S.W.3d 561, 566 (Tex. 2002) (jury generally has discretion to award damages within the range of evidence presented at trial); *Ho & Huang Props., L.P. v. Parkway Dental Assocs., P.A.*, 529 S.W.3d 102, 118 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (same).

Byrd also explained how he calculated the "Extra Foreman Costs." According to Byrd, replacing James on the project required Turner to "tighten up the foreman to crew ratio" because of the complex nature of the project and Turner's "step[ping] in midstream." Byrd stated that he examined James's records before the termination, which indicated that James's typical ratio between craft workers and foremen was one foreman for every ten workers. But after James's termination, Turner reduced the foreman to craft worker ratio to one foreman for every five or six workers. Byrd explained that these extra costs arose "[b]ecause of the transition." Byrd additionally stated that "tighten[ing] up the foreman to crew ratio . . . is a good management practice from the construction management standpoint." He testified that the cost for these additional foremen—necessitated only by the removal of James's scope of work and transition of that work to Turner—was $842,415, which is exactly the sum the jury awarded. Byrd unequivocally stated that these damages were "reasonable

and necessary costs that are attributable to Westlake Chemical's removal of James'[s] mechanical scope."

In short, Byrd provided expert testimony summarizing the extra costs associated with the termination of James's mechanical scope of work and transition of this work scope to Turner. The jury determined that some, but not all, of these extra costs should be borne by James. Considering the evidence in the light most favorable to the jury's finding in response to Question 3E, indulging every reasonable inference that would support it, crediting favorable evidence if a reasonable fact finder could, and disregarding contrary evidence unless a reasonable fact finder could not, we conclude the trial evidence would enable reasonable and fair-minded people to find the damages as awarded by the jury. *See, e.g.*, *Ho & Huang Props.*, 529 S.W.3d at 118. Accordingly, we overrule James's legal sufficiency challenge to the jury's damage awards.

### 5. *Argument that damages are barred by paragraph 26*

In a final point under issue one, and as an alternative to their legal sufficiency challenge, appellants assert that the damages awarded are consequential and barred by the contract's consequential damages provision, paragraph 26, which provides that neither "shall be liable to the other" for "any consequential, incidental, indirect . . . damages of any kind or character."

Actual damages may be either direct or consequential. *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex. 1997). "Direct damages are the necessary and usual result of the defendant's wrongful act; they flow naturally and necessarily from the wrong. Direct damages compensate the plaintiff for the loss that is conclusively presumed to have been foreseen by the defendant from his wrongful act." *Id.* (citations omitted). In contrast, consequential damages are damages that result naturally, but not necessarily, from a breach. *See id.* However,

39

"if particular damages are specifically accounted for in the contract, they are direct, not consequential, in nature." *McKinney & Moore, Inc. v. City of Longview*, No. 14-08-00628-CV, 2009 WL 4577348, at *5 (Tex. App.—Houston [14th Dist.] Dec. 8, 2009, pet. denied) (mem. op.).

Appellants claim the damages awarded by the jury are consequential because: (1) they were incurred by Vinyls, not Chemical; (2) they are not specifically accounted for in the construction contract and were not foreseeable by James; and (3) the increased foreman costs constitute "loss of productivity, loss of efficiency, or acceleration" type costs specifically foreclosed by paragraph 26.

As to appellants' first complaint, we have determined that Chemical, as Vinyls's agent, was entitled to sue in its own name and recover damages on behalf of Vinyls.

James's complaints that the damages are consequential because they are not specifically accounted for in the contract or because the increased foreman costs constitute loss of productivity are unpersuasive. As noted above, the termination provision provides in pertinent part:

> [Chemical] shall have the unrestricted right to take possession of the Work or the portion thereof terminated and to purchase and/or hire materials, tools, supervision, labor, and equipment for the completion of the Work or of the unremedied condition, as [Chemical] elects. Any extra costs in excess of the Contract Price incurred by [Chemical] in this regard shall be at the expense of [James].

Under this provision, James is responsible for Chemical's costs in excess of the contract price for purchasing or hiring supervision (increased foreman costs) and labor (safety training costs) to complete the work. Because these categories of damages are specifically referenced in the construction contract, they are direct damages. *See McKinney & Moore*, 2009 WL 4577348, at *5 (holding that expenses

40

incurred under construction contract were direct damages because they were contemplated in contract provision that required defendant to reimburse plaintiff for damage occurring during work on project that were caused by negligence or fault of defendant or its agents); *see also Tenn. Gas Pipeline Co. v. Technip USA Corp.*, No. 01-06-00535-CV, 2008 WL 3876141, at \*8-9 (Tex. App.—Houston [1st Dist.] Aug. 21, 2008, pets. denied) (mem. op. on reh'g) (holding costs of providing power during construction delay were direct damages because contract provision specified that owner would provide electricity to construction site).

In sum, we conclude that the damages awarded by the jury for safety training costs and increased foreman costs were direct damages, and we overrule this portion of appellants' issue.

\*    \*    \*

For the above reasons, we reject appellants' challenges to the extent the judgment grants recovery to Chemical based on the jury's findings that James breached paragraph 21.3. We affirm the portion of the judgment awarding to Chemical $1,054,251.81 in compensatory damages, together with all applicable pre- and post-judgment interest and taxable costs associated with that award. Due to our disposition of this issue, we need not address appellants' alternative arguments in their second issue to the same damages awarded under paragraph 17.2. *See* Tex. R. App. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal."); *see also Waite Hill Servs., Inc. v. World Class Metal Works, Inc.*, 959 S.W.2d 182, 184 (Tex. 1998) (explaining that a plaintiff is not entitled to recovery of the same damages for different theories of liability). Additionally, our holding necessarily defeats James's requested relief in issue seven regarding its paragraph 21.3 counterclaim; and Primoris's argument in issue five, in which

41

Primoris contends it cannot be liable on the Guaranty because James is not liable for breach of the construction contract. We overrule issues one, two, five, and seven.

## B.    Indemnification — Paragraph 19.1

In their third issue, appellants contend that the trial court erred in rendering judgment for Chemical on Chemical's indemnification claim under paragraph 19.1. That paragraph states:

> INDEMNIFICATION BY [JAMES]. [JAMES] SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS [CHEMICAL], ITS AFFILIATES, AGENTS, DIRECTORS, OFFICERS, SHAREHOLDERS, MEMBERS, REPRESENTATIVES, AGENTS, EMPLOYEES, SUCCESSORS, ASSIGNS AND INDEPENDENT CONTRACTORS (OTHER THAN [JAMES]) FROM AND AGAINST ANY AND ALL LIABILITIES, CLAIMS, LOSSES, DAMAGES, COSTS, PENALTIES, FINES, AND FEES, AS WELL AS COSTS OF DEFENSE, SETTLEMENT, AND REASONABLE ATTORNEY'S FEES (COLLECTIVELY, THE "LOSSES") ARISING OUT OF SICKNESS, INJURY TO, OR DEATH OF ANY PERSON, OR DAMAGE TO OR DESTRUCTION OF REAL OR PERSONAL PROPERTY, INCUDING LOSS OF USE THEREOF, ARISING OUT OF, IN CONNECTION WITH, OR IN ANY WAY RELATED TO [JAMES]'S OR ITS SUBCONTRACTORS' PERFORMANCE OF THE WORK OR PRESENCE ON [CHEMICAL]'S PREMISES, BUT ONLY TO THE EXTENT OF [JAMES]'S OR ITS SUBCONTRACTORS' NEGLIGENCE, STRICT LIABILTY OR OTHER LEGAL FAULT.

As noted above, in December 2012, one of James's employees, Gregory Price, sustained a head injury from a fall on the job. Price tragically died from his injuries shortly afterward. OSHA cited James for a "serious" safety violation because the fatality resulted from a lack of appropriate flagging personnel. Price's family brought suit in Ascension Parish, Louisiana, against James and Chemical, among others, for wrongful death.

42

As part of the present action, Chemical alleged that James failed to indemnify it for the Price litigation in accordance with paragraph 19.1. Chemical presented evidence that it incurred over $205,000 in attorney's fees defending the Price litigation. The jury found that James failed to comply with paragraph 19.1 and awarded Chemical $102,767.69 in reasonable and necessary attorney's fees and costs.

Appellants raise two arguments challenging this part of the judgment. First, appellants contend that Chemical's prior material breach of paragraph 21.3—by wrongfully terminating James—bars recovery. Second, appellants say no evidence supports the damages.

### 1. *No prior material breach*

Appellants argue that Chemical failed to properly terminate James's performance under paragraph 21.3, which constitutes a prior material breach relieving it of any indemnification liability. *See Pinnacle Anesthesia Consultants, P.A. v. Fisher*, 309 S.W.3d 93, 99 (Tex. App.—Dallas 2009, pet. denied) ("A defendant's improper termination of a contract is a breach of the contract as a matter of law.") (citing *Gunter Hotel of San Antonio Inc. v. Buck*, 775 S.W.2d 689, 697 (Tex. App.—San Antonio 1989, writ denied); *Incorporated Carriers, Ltd. v. Crocker*, 639 S.W.2d 338, 340 (Tex. App.—Texarkana 1982, no writ); *Howell v. Kelly*, 534 S.W.2d 737, 740 (Tex. App.—Houston [1st Dist.] 1976, no writ)). We disagree.

Our disposition of appellants' first issue forecloses this argument. As we have determined, legally sufficient evidence supports the jury's findings that Chemical complied with the parts of paragraph 21.3 appellants say were violated, and that James breached paragraph 21.3. Moreover, if it were true that Chemical failed to fulfill paragraph 21.3's default and notice provisions, as appellants contend, that

43

failure would not constitute a breach of contract giving rise to liability; it would merely amount to a failure to satisfy conditions precedent. *See, e.g.*, *Solar Applications*, 327 S.W.3d at 108. Failure to satisfy a condition precedent generally results in no liability, but failure to perform a contractual covenant may create liability. *See Centex Corp. v. Dalton*, 840 S.W.2d 952, 956 (Tex. 1992). If Chemical erred in determining an event of default occurred or failed to provide proper notice under section 21.3, then, at most, James would be excused from the obligations conditioned on those events. *See, e.g.*, *Solar Applications*, 327 S.W.3d at 108; *McMahan v. Greenwood*, 108 S.W.3d 467, 484 (Tex. App.—Houston [14th Dist.] 2003, pet. denied); Restatement (Second) of Contracts § 225. The failure would not constitute a prior material breach that would excuse James's obligations under the indemnification provision.

### 2. *Legal sufficiency challenge to damages*

As fair and reasonable compensation for James's breach of the indemnity provision, the jury awarded to Chemical $102,767.69, which consisted of reasonable and necessary attorney's fees and costs incurred by Chemical in defending the Price litigation. Appellants argue that the award is unsupported by legally sufficient evidence because Chemical failed to prove the fees are reasonable. There are two parts to their argument: (1) the sponsoring expert witness was not qualified to opine as to reasonableness of attorney's fees in a Louisiana wrongful-death case; and (2) the expert's opinions are conclusory and speculative.

"'If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise.'" *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 800 (Tex. 2006) (quoting Tex. R. Evid. 702). Expert testimony is

44

admissible when (1) the expert is qualified, and (2) the testimony is relevant and based on a reliable foundation. *Id.* We review the trial court's determination that an expert is qualified for abuse of discretion. *Id.* The test for abuse of discretion is whether the trial court acted without reference to guiding rules or principles. *Id.*

Whether a proffered expert is qualified is not subject to rigid formula. *Mega Child Care, Inc. v. Tex. Dept. of Protective & Regulatory Servs.*, 29 S.W.3d 303, 310 (Tex. App.—Houston [14th Dist.] 2000, no pet.). There must be, however, a "fit" between the subject matter and the expert's familiarity with that subject matter. *See Broders v. Heise*, 924 S.W.2d 148, 153 (Tex. 1996). "The proponent must establish that the expert has knowledge, skill, experience, training, or education regarding the specific issue before the trial court which would qualify the expert to give an opinion on that particular subject." *Mega Child Care*, 29 S.W.3d at 310.

Chemical presented Texas attorney Lee Kaplan to testify about the reasonableness and necessity of the attorney's fees Chemical incurred in defending the Price litigation. Appellants assert that Kaplan was not qualified because he is not licensed to practice law in Louisiana, is not familiar with Louisiana law or procedure, is not familiar with practices in Ascension Parish or the fees customarily charged for legal services in that locality, and is not familiar with wrongful-death lawsuits.

An appellate challenge to an expert's qualifications must be preserved by timely objection in the trial court. *See, e.g.*, *Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 143-44 (Tex. 2004). At trial, James objected to Kaplan's qualifications, but only on the grounds that, "[a]lthough the witness did testify he did have litigation in Louisiana, he's not licensed in Louisiana, and doesn't practice in Louisiana, and doesn't qualify for providing an opinion on that." Thus, we limit our review to

whether the trial court abused its discretion in determining that Kaplan was qualified to opine about the reasonableness of attorney's fees in Louisiana.

We conclude Chemical met its burden. Kaplan testified that he has litigated cases in Louisiana, has been admitted *pro hac vice* there, and his firm frequently litigates or quotes fees to potential clients there. He stated that the fee structure in Louisiana is generally about fifteen to twenty percent lower than in Houston, Texas. Kaplan explained that he has law partners who are licensed in Louisiana, and he is familiar with the hourly rates these partners charge in Louisiana. Kaplan also testified that he is familiar with the law firm that represented Chemical in the Price litigation, which was a Houston firm with a New Orleans office. He stated that he is familiar with litigating wrongful-death cases in small counties, and he additionally explained that he examined the pleadings in the wrongful-death suit. On balance, we conclude that the trial court did not abuse its discretion, and there exists a sufficient "fit between the subject matter and [Kaplan]'s familiarity with that subject matter." *See Mendez*, 204 S.W.3d at 800; *Broders*, 924 S.W.2d at 153.

Finally, appellants contend that Kaplan's testimony amounted to no evidence of Chemical's damages because it is conclusory and speculative. "An expert's testimony is conclusory when the expert asserts a conclusion with no basis." *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 223 (Tex. 2019). Such a no-evidence complaint may be raised for the first time on appeal. *See id.* As always, when considering a no-evidence point, we view the evidence in the light most favorable to the verdict, including every reasonable inference to support it. *See id.*

The jury was instructed that the only element of damages it could consider was "the costs of defense and reasonable attorney's fees incurred by Westlake Chemical in defending" the wrongful-death suit. The jury was further instructed on

46

the *Arthur Andersen*[31] factors:

> Factors to consider in determining a reasonable fee include—
>
> 1. The time and labor required, the novelty and difficulty of the questions involved and the skill required to perform the legal services properly.
>
> 2. The likelihood that the acceptance of the particular employment will preclude other employment by the lawyer.
>
> 3. The fee customarily charged in the locality for similar legal services.
>
> 4. The amount involved and the results obtained.
>
> 5. The time limitations imposed by the client or by the circumstances.
>
> 6. The nature and length of the professional relationship with the client.
>
> 7. The experience, reputation, and ability of the lawyer or lawyers performing these services.
>
> 8. Whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

While these factors generally guide the fact finder on determining reasonableness of attorney's fees, the proponent need not present evidence on all of them. *See Messier v. Messier*, 458 S.W.3d 155, 166-67 (Tex. App.—Houston [14th Dist.] 2015, no pet.); *Arthur J. Gallagher & Co. v. Dieterich*, 270 S.W3d 695, 706 (Tex. App.—Dallas 2008, no pet.). Kaplan testified that he considered only four of these factors—1, 3, 4, and 7—relevant to the Price litigation.

As to the first factor, Kaplan testified that the fees incurred were reasonable because the plaintiff demanded and obtained discovery, requiring Chemical to participate in motion practice over the course of nine months. Kaplan additionally explained that, in a wrongful-death case, the use of more experienced lawyers, such

---

[31] *Arthur Andersen*, 945 S.W.2d at 818.

as those Chemical engaged, is appropriate due to the dispute's gravity. As to factor three, Kaplan testified that, although he personally "didn't live that case," the fees involved were "in line with what you customarily charge to handle the case." Turning to the fourth factor, Kaplan explained that the Price litigation likely involved "a lot of money" because Price had a family and survivors. He also pointed out that Chemical's lawyers prevailed on summary judgment, thus sparing Chemical from a wrongful-death trial. Finally, as to the seventh factor, Kaplan testified that the lawyers involved were capable, senior lawyers; the firm enjoys a "very good reputation;" and the lawyers "handled the case the way you're supposed to."

After presenting this evidence, Chemical requested $205,533.39, and the jury awarded approximately half of that amount. Kaplan's opinion that the fees involved in the wrongful-death suit were reasonable is supported by consideration of several of the *Arthur Andersen* factors. Accordingly, Chemical presented a factual basis for Kaplan's opinions, and his testimony is not conclusory. *See, e.g.*, *Bombardier Aerospace Corp.*, 572 S.W.3d at 227-28.

We conclude that legally sufficient evidence supports the jury's damage award on Chemical's indemnification claim and therefore we affirm that portion of the amended judgment awarding Chemical recovery for $102,767.69, together with all applicable pre- and post-judgment interest and taxable costs associated with that award. We overrule appellants' third issue.

## C. Attorney's Fees

In issue four, Primoris challenges Chemical's recovery of $2,923,600.50 trial and conditional appellate attorney's fees. Primoris requests a rendition of judgment because no evidence supports the award. Alternatively, Primoris seeks a remand because Chemical failed to segregate recoverable fees from non-recoverable fees, and because the award is excessive.

48

1. *No-evidence challenge*

Chemical pleaded a breach of contract claim against James based on the construction contract and against Primoris based on the Guaranty. Chemical also requested reasonable and necessary attorney's fees. Texas follows the "American rule" that attorney's fees paid to prosecute or defend a lawsuit cannot be recovered in that suit absent a statute or contract that allows for their recovery. *See Alyeska Pipeline Serv. Co. v. Wilderness Society*, 421 U.S. 240, 247 (1975); *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 120 (Tex. 2009). Neither the construction contract nor the Guaranty provide for an award of attorney's fees to a prevailing party. Thus, the only potential basis for recovery of attorney's fees is Texas Civil Practice and Remedies Code chapter 38. *See* Tex. Civ. Prac. & Rem. Code § 38.001(8). When a party prevails and is awarded damages on a breach-of-contract claim, it is entitled to attorney's fees under section 38.001. *Horizon Health Corp. v. Acadia Healthcare Co.*, 520 S.W.3d 848, 883 (Tex. 2017) (citing *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 201 (Tex. 2004)).

Chemical secured findings that James breached the construction contract. We have upheld James's liability under paragraph 21.3 for breach of contract and compensatory damages. However, the court did not submit a jury question on Chemical's breach-of-contract claim against Primoris. According to the record, the parties stipulated that if the jury found that James breached the construction contract, and if the jury awarded damages resulting from the breach, then Primoris is jointly and severally liable for the amounts James owes to Chemical because Primoris would have breached the Guaranty.[32]

---

[32] Counsel stated the following on the record:

[Chemical's counsel:] I understand that the Court ruled that if the jury finds that

49

The Guaranty itself states in relevant part:

> For good and valuable consideration, the sufficiency of which is hereby acknowledged, [Primoris] hereby unconditionally and irrevocably guarantees to [Chemical] . . . the due and punctual performance of, and compliance with, all obligations, covenants, terms and conditions to be performed or complied with by [James] pursuant to that certain Contract Agreement dated as of May 18 2012 between [James] and [Chemical] (the "Agreement") (all obligations of [James] under the Agreement being referred to collectively herein as the "Obligations"). Such Guarantee will not terminate until:
>
> a. the Obligations have been performed in full by [James]; or
>
> b. performance has been waived in writing by [Chemical].

Based on the jury's breach-of-contract findings against James, the parties' stipulation, and authority holding that chapter 38 does not permit recovery of attorney's fees from a limited liability company, the trial court rendered judgment for Chemical's attorney's fees against Primoris only.

---

James failed to comply with any provision of the Construction Contract with Westlake Chemical, either Section 17.2, 21.3, or 19.1, and if the jury finds that there are damages greater than zero resulting from the failures to comply with any of these provisions, then Primoris is jointly and severally liable . . . with James to Westlake Chemical under the parent guarantee for the same amount that James is liable for to Westlake Chemical under the Construction Contract, because it would then have failed to comply with the Primoris parent guarantee, and would owe the same amount of damages under the guarantee.

Based on that ruling, we are not submitting jury questions on liability or damages for our claim under the guarantee; but by doing so, want to make it clear on the record that we are doing it based on the Court's ruling, and we're not waiving our right to recover against Primoris under the guarantee. And we expect that the Court will render judgment on [Chemical's] claim against Primoris under the guarantee, as appropriate, based on that ruling after the jury's verdict.

THE COURT: [Counsel?]

[James's counsel:] Yes, sir. We understand and agree to that.

In its no-evidence challenge, Primoris contends that it is not liable for attorney's fees under the Guaranty because James, the principal obligor, is not liable for attorney's fees for breaching the construction contract. Primoris relies on the Guaranty language and case law holding that a guarantor's liability is measured by, and limited to, the principal obligor's liability unless a more extensive or more limited liability is expressly set forth in the guaranty agreement. *See Material P'ships, Inc. v. Ventura*, 102 S.W.3d 252, 265 (Tex. App.—Houston [14th Dist.] 2003, pet. denied); *W. Bank-Downtown v. Carline*, 757 S.W.2d 111, 113 (Tex. App.—Houston [1st Dist.] 1988, writ denied).

If the only contractual breach at issue were James's breach of the construction contract, we would agree with Primoris that the Guaranty does not support the judgment because the Guaranty does not impose on Primoris any duty to pay sums that James does not owe under the construction contract. *See Material P'ships*, 102 S.W.3d at 265. In signing the Guaranty, Primoris unconditionally and irrevocably guaranteed James's "due and punctual performance of, and compliance with" the construction contract. James has no obligation to pay the attorney's fees Chemical incurred to prove James breached the construction contract; thus, Primoris generally has no obligation to pay those attorney's fees either.

However, Chemical's claim for attorney's fees is based on Primoris's alleged breach of the Guaranty, not on James's liability for fees. Chemical argues that Primoris breached the separate Guaranty, and that it is entitled to fees as a result of that breach regardless whether chapter 38 permits a fee award against James for its breach of the construction contract.

To recover attorney's fees from Primoris under section 38.001, Chemical had to prevail on its breach-of-contract claim on the Guaranty against Primoris and

recover damages.[33]  *See Ventling v. Johnson*, 466 S.W.3d 143, 154 (Tex. 2015); *Green Int'l v. Solis*, 951 S.W.2d 384, 390 (Tex. 1997).  To succeed on its claim for breach of the Guaranty, Chemical had to establish:  (1) the existence and ownership of the guaranty; (2) the terms of the underlying contract by the holder; (3) the occurrence of the condition on which liability is based; and (4) the guarantor's failure or refusal to perform the promise.  *See Wasserberg v. RES-TX One, LLC*, No. 14-13-00674-CV, 2014 WL 6922545, at *6 (Tex. App.—Houston [14th Dist.] Dec. 9, 2014, pet. denied) (mem. op.) (citing *Wasserberg v. Flooring Servs. of Tex., LLC*, 376 S.W.3d 202, 205 (Tex. App.—Houston [14th Dist.] 2012, no pet.)).  The Guaranty and the construction contract are included in the record and their existence and terms are not disputed.  In a March 30, 2016 letter, Chemical demanded that James and Primoris pay damages resulting from James's breaches of the construction contract within thirty days.  Primoris did not tender payment within thirty days.  By stipulation read into the record, the parties agreed that if the jury found that James failed to comply with the construction contract and caused damages greater than zero, then Primoris is jointly and severally liable to Chemical under the Guaranty for the same amount James owes because Primoris *would then have failed to comply with the Guaranty*.  James, Primoris, and Chemical thus acknowledged that if James breached the construction contract then Primoris was in breach of the Guaranty.

The parties' stipulation accords with Texas guaranty law, which recognizes two distinct types of guaranty:  a guaranty of collection (or conditional guaranty) and a guaranty of payment (or unconditional guaranty).  *See Universal Metals & Mach., Inc. v. Bohart*, 539 S.W.2d 874, 877 (Tex. 1976); *Ford v. Darwin*, 767

---

[33] Chemical also had to present its claim to Primoris, and payment for the just amount owed must not have been tendered within thirty days after the claim was presented.  Tex. Civ. Prac. & Rem. Code § 38.002.  Chemical presented its demand to Primoris on March 30, 2016.

S.W.2d 851, 854 (Tex. App.—Dallas 1989, writ denied). A guaranty of payment, such as the unconditional Guaranty in today's case, is an obligation to pay the debt when due if the debtor does not. *Cox v. Lerman*, 949 S.W.2d 527, 530 (Tex. App.— Houston [14th Dist.] 1997, no writ). It requires no condition precedent to enforcement against the guarantor other than a default by the principal debtor. *Id*. Primoris bound itself to James's obligations under the construction contract by the unambiguous language of the Guaranty. As acknowledged by the stipulation, Primoris had a payment obligation immediately upon James's breach, and it remained in breach of the Guaranty as long as it failed to perform. *See Mid-S. Telecomms. Co. v. Best*, 184 S.W.3d 386, 391 (Tex. App.—Austin 2006, no pet.).

Citing *Colonial American Casualty & Surety Co. v. Scherer*, 214 S.W.3d 725, 735 (Tex. App.—Austin 2007, no pet.), Primoris argues that a surety's liability for attorney's fees under section 38.001 cannot extend beyond the liability of its principal. *Scherer* is distinguishable, however, because the claimant in that case neither pleaded a breach-of-contract claim against the surety nor sought attorney's fees under section 38.001. *Id*. at 734-35. Chemical did both.

Additionally, Primoris disputes its liability for attorney's fees because the Guaranty is governed by Louisiana law,[34] which, according to Primoris, states that a guarantor is not liable for attorney's fees incurred in enforcing a guaranty unless the guaranty agreement or the underlying contract provides for their recovery. Primoris, however, does not direct us to where in the record it urged the trial court to apply Louisiana law and proved the content and applicability of that law. We presume that Texas and Louisiana law agree in any relevant respects. *See Lujan v. Navistar Fin. Corp.*, 433 S.W.3d 699, 706 n.1 (Tex. App.—Houston [1st Dist.] 2014, no pet.);

---

[34] Paragraph 5 of the Guaranty states: "This Guarantee shall be governed by and construed in accordance with the laws of Louisiana."

*Collins v. Tex. Mall, L.P.*, 297 S.W.3d 409, 414-15 (Tex. App.—Fort Worth 2009, no pet.); *see also* Tex. R. Evid. 202 (providing that a party may compel a trial court to take judicial notice of another state's law by filing a motion, giving notice to the other parties, and furnishing the court with sufficient information to enable it to properly comply with the request).

Primoris cannot be made to pay Chemical's attorney's fees based solely on James's breach of the construction contract; but Primoris can be made to pay Chemical's attorney's fees based on its breach of the Guaranty—which was shown once the jury found James breached the construction contract and found damages. Based on the jury findings and the stipulation, Chemical established (1) that Primoris failed to comply with the Guaranty and (2) damages. *See Wasserberg*, 2014 WL 6922545, at *7 (upholding summary judgment for breach of guaranty agreement). Therefore, attorney's fees are recoverable against Primoris under section 38.001. As Primoris raises no other legal sufficiency challenges to the attorney's fees, we overrule the legal sufficiency portion of issue four.

2.    *Primoris's request for remand*

Next, we consider Primoris's request for a new trial on attorney's fees. Primoris argues first that Chemical failed to segregate fees incurred in pursuing direct damages from those incurred in pursuing consequential damages. Primoris states that because consequential damages are not recoverable under paragraph 26 of the construction contract, Chemical may not recover attorney's fees incurred in pursuing those types of damages. Chemical responds that no such segregation duty is required because: (1) the law mandates fee segregation only as to "claims," not damage categories; and (2) the fees incurred in pursuing all contract damages were "intertwined."

54

Fee claimants must segregate fees between claims for which they are recoverable and claims for which they are not. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 311 (Tex. 2006). "[I]f any attorney's fees relate solely to a claim for which such fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees." *Id*. at 313. "[I]t is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated." *Id*. at 313-14.

At the time of trial, Chemical's only pleaded claim was a breach-of-contract claim against two defendants, James and Primoris. Breach of contract is a claim for which attorney's fees are recoverable. Though other claims and parties were involved previously, Chemical segregated and excluded fees incurred in pursuing claims against James or others that ultimately settled. Chemical also excluded fees incurred solely in defense of James's counterclaim.[35]

Primoris argues nonetheless that Chemical was required to segregate fees for work developing and supporting requested damages that Primoris characterizes as consequential from those it characterizes as direct. For example, the trial court determined as a matter of law that certain "chlorine costs" Chemical sought were consequential damages and therefore were barred by the construction contract's consequential damage provision—a ruling Chemical does not contest. According to Primoris, all other categories of damage Chemical sought in its damage model (except for the two categories awarded by the jury) similarly are barred because they too are consequential.[36] Primoris asserts that Chemical should not recover fees incurred in pursuing the "chlorine costs" (which was not submitted to the jury), or

---

[35] Chemical then reduced its requested fee by an additional ten percent to adjust for any record-keeping or duplication errors.

[36] Specifically, Primoris contends that the requested damages in categories B, C, E, and F1-F8—which the jury did not award—are consequential.

in pursuing damage categories B, C, E, and F1-F8, because Chemical is "contractually barred from asserting those claims against James" under paragraph 26. Primoris reasons that the attorney's fee award is error because it includes fees incurred in seeking all of Chemical's damages although most of them are unrecoverable under paragraph 26.

Primoris describes a breach of contract claimant's purported duty to segregate between services performed to advance distinct categories of damages when some damages may or may not ultimately be barred by an affirmative defense, such as in this case a consequential damages provision. We have found no Texas case imposing such a segregation duty, and Primoris cites none. Texas law so far has required segregation of attorney's fees only among those incurred in advancing "claims" for which fees are recoverable and those for which they are unrecoverable. *See Tony Gullo*, 212 S.W.3d at 313-14; *In re Lesikar*, 285 S.W.3d 577, 585 (Tex. App.—Houston [14th Dist.] 2009, no pet.); *see also 7979 Airport Garage, L.L.C. v. Dollar Rent A Car Sys., Inc.*, 245 S.W.3d 488, 507 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) ("[W]hen a defendant asserts a counterclaim that the plaintiff must overcome in order to fully recover on its contract claim, the attorney's fees necessary to defeat that counterclaim are likewise recoverable.") (citing *Varner v. Cardenas*, 218 S.W.3d 68, 70 (Tex. 2007)). Here, Chemical's requested fees relate only to breach-of-contract claims for which fees are recoverable. Segregation is not required when attorney's fees are recoverable for all claims. *Land v. Land*, 561 S.W.3d 624, 640 (Tex. App.—Houston [14th Dist.] 2018, pet. denied). Accordingly, this portion of Primoris's argument lacks merit.

Next, Primoris contends that Chemical failed to segregate the fees incurred in prosecuting its claim against Primoris for breach of the Guaranty from those incurred in prosecuting its claim against James for breach of the construction contract. But,

as explained, Chemical could not prove that Primoris breached the Guaranty and recover on that claim without also proving that James breached the construction contract. A guaranty of payment cannot be enforced against the guarantor until the principal debtor defaults on the underlying obligation. *See Cox*, 949 S.W.2d at 530. All of Chemical's attorney's fees incurred in pursuing its breach-of-contract claim against James were necessary to establish a right of recovery on its breach-of-contract claim against Primoris. Thus, these services were intertwined and no segregation was required. *See Tony Gullo*, 212 S.W.3d at 313-14.

Finally, Primoris argues that the attorney's fees are excessive. Its argument is premised, however, on the assumption that we have reversed Chemical's recovery of contract damages under paragraphs 17.2 and 21.3, thus leaving intact at most Chemical's indemnity damages of $102,767.69 for breach of paragraph 19.1. Because we have affirmed the judgment awarding Chemical its actual damages resulting from James's breach of paragraph 21.3, Primoris's excessiveness argument fails and we thus overrule Primoris's fourth issue in its entirety.

## Chemical's Cross-Issues

### A. Waiver of Consequential Damages

Chemical's first cross-issue concerns the meaning and effect of paragraph 26 of the construction contract, entitled "Waiver of Consequential Damages." According to James, paragraph 26 is a covenant not to sue for the damages described therein. James alleged in a counterclaim that Chemical breached paragraph 26 by affirmatively seeking damages that James contends are consequential. Agreeing with James, the jury found that Chemical breached paragraph 26 and awarded damages in the form of reasonable and necessary attorney's fees that James incurred in defending against Chemical's attempts to recover consequential damages. The

57

trial court rendered judgment in James's favor for $1,270,962.89, plus conditional appellate fees based on the jury verdict.

Chemical contends that the judgment against it on James's counterclaim is error for a number of reasons, but we address only the first one because we find it dispositive. According to Chemical, paragraph 26 is a waiver of consequential damages—an affirmative defense—not a covenant not to sue, and thus cannot support a breach of contract claim or an award of attorney's fees. James responds that paragraph 26 includes both a waiver of consequential damages and a covenant not to sue. Resolving this issue requires us to determine the meaning of paragraph 26.

1. *Standard of review*

Interpretation of an unambiguous contract is a question of law for the court to decide de novo. *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 763 (Tex. 2018). Again, when a contract's meaning is disputed, our primary objective is to ascertain and give effect to the parties' intent as expressed in the instrument. *Id*.; *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011). Objective manifestations of intent control, not what one side or the other alleges they intended to say but did not. *URI*, 543 S.W.3d at 763-64. We therefore "presume parties intend what the words of their contract say" and interpret contract language according to its "plain, ordinary, and generally accepted meaning" unless the instrument directs otherwise. *Id*. at 764. We also examine and consider the entire contract in an effort to harmonize and give effect to all provisions of the contract so that none are rendered meaningless. *Italian Cowboy Partners*, 341 S.W.3d at 333.

2. *Application*

We begin by quoting paragraph 26 in its entirety:

26    **WAIVER OF CONSEQUENTIAL DAMAGES**

Neither [Chemical] nor [James] shall be liable to the other for any consequential, incidental, indirect or punitive damages of any kind or character, including, but not limited to, loss of use, loss of profit, loss of revenue, loss of productivity, loss of efficiency, or acceleration costs whenever arising under this Contract or as a result of, relating to or in connection with the Work and *no claim shall be made by either [Chemical] or [James] against the other for such damages* REGARDLESS WHETHER SUCH CLAIM IS BASED OR CLAIMED TO BE BASED ON NEGLIGENCE OR STRICT LIABILITY (INCLUDING SOLE, JOINT, ACTIVE, PASSIVE, CONCURRENT NEGLIGENCE OR GROSS NEGLIGENCE) OR ANY OTHER THEORY OF LEGAL LIABILITY, AND INCLUDING PRE-EXISTING CONDITIONS BUT EXCLUDING GROSS NEGLIGENCE AND WILLFUL MISCONDUCT.

(Italics added for emphasis; capitalization and bold in original). James emphasizes the italicized language that "no claim shall be made" for the described damages as support for its argument that paragraph 26 is a covenant not to sue. Chemical counters that James ignores the rest of the paragraph, including particularly the first clause and the capitalized language, which show that the parties intended this section merely to prevent either party from recovering on a claim for "consequential, incidental, indirect or punitive" damages regardless of the legal theory of liability asserted.

Chemical relies on *National Property Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 428-29 (Tex. 2015) (per curiam), a case that examined among other issues whether a party who releases a claim and later files suit on that claim necessarily breaches the release agreement, and whether the release and other agreements there at issue included a covenant not to sue. In that case, the parties

59

disputed the meaning of a mediated settlement agreement, an oral side agreement, and a subsequent written release. *Id*. at 421. After disputes arose over the scope and meaning of the settlement agreements and the release, Westergren claimed the settlement had not been fully performed and sued the other parties for breach of contract and other claims. The other parties filed a counterclaim, asserting that Westergren breached the settlement agreement and the release by filing suit against them. *Id*. at 422. The trial court rendered a take-nothing judgment on the counterclaim, and the court of appeals affirmed. In the supreme court, the counterclaimants argued that a party who releases a claim and later files suit on that claim breaches the release agreement. *Id*. at 428. The court rejected this argument based on the release language contained in both the settlement agreement and the subsequent release document. Neither instrument, the court held, contained an express or implied covenant not to sue. *Id*. Rather, the language in those documents indicated an intent to establish an affirmative defense to any future suit. *Id*. As the court stated, "[a]lthough the release provides an affirmative defense to future suits, we cannot construe it as including a covenant not to sue where, in fact, the plain language does not bar future suits." *Id*. at 428-29. The court affirmed the judgment that Westergren did not breach the settlement agreement and release by filing the later suit. Chemical argues that paragraph 26, like the contract language examined in *Westergren*, functions as a defense to a claim of consequential damages, not as a basis for a breach-of-contract claim.

James, on the other hand, likens the present text to language it says several courts have construed or characterized as a covenant not to sue.[37] Among these, the

---

[37] James cites *Palestine Contractors, Inc. v. Perkins*, 386 S.W.2d 764, 765 n.1 (Tex. 1964) (reciting the parties' agreement "not to sue, make claim, or institute any action or proceeding directly or indirectly against" the other "to recover damages of any kind or character"); *Felix v. Prosperity Bank*, No. 01-14-00997-CV, 2015 WL 9242048, at *1 (Tex. App.—Houston [1st Dist.] Dec. 17, 2015, no pet.) (mem. op.) (bank agreement with depositor provided that, if depositor

most comparable contract text appears in the First Court of Appeals's opinion in *Felix*. *See* 2015 WL 9242048, at *1. There, fraudulent wire transfers allegedly were made from Felix's deposit account with Prosperity Bank. The account was governed by a written deposit agreement, which required Felix to examine his statements and comply with specified procedures for reporting unauthorized transactions. *Id.* at *1. The agreement spelled out certain consequences for the failure to timely report disputed transactions, including that "you cannot assert a claim against us" as to any challenged items in a particular statement not timely reported. *Id.* Felix sued the bank for unauthorized transfers. The bank moved for summary judgment based on the agreement and Felix's failure to timely notify the bank of the subject transactions. *Id.* The trial court granted summary judgment to the bank but awarded no attorney's fees. On appeal, the bank argued that it was entitled to fees under Civil Practice and Remedies Code chapter 38 because Felix breached the contract by suing the bank despite his agreement that he could not assert a claim if he failed to report unauthorized transactions timely. *Id.* at *2. The court of appeals agreed with the bank, concluding that the bank had enforced a material contract right and thus was entitled to fees. *Id.* at *3. As James notes, the *Felix* court referred to the deposit agreement's relevant language as a "covenant not to sue." But the court did not discuss whether that was an appropriate characterization and it does not appear the

---

failed to meet certain conditions, depositor "cannot assert a claim against us on any items in that statement, and the loss will be entirely yours"); *Caspary v. Woodruff*, No. 13-98-00106-CV, 2000 WL 35729203, at *11 (Tex. App.—Corpus Christi Aug. 31, 2000, pet. denied) (not designated for publication) (stock repurchase agreement provided, "sellers covenant . . . to neither institute nor participate in any arbitration or legal action" against other party); *Pape Equip. Co. v. I.C.S., Inc.*, 737 S.W.2d 397, 400-01 (Tex. App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.) (agreement "not to sue, claim or make claims or institute any action or proceeding directly or indirectly against" other "to recover damages of any kind or character"); *see also Knutson v. Morton Foods, Inc.*, 603 S.W.2d 805, 811 (Tex. 1980) (Denton, J., concurring) (stating that "a covenant not to sue is merely a promise not to pursue a claim or cause of action.") (citing *Robertson v. Trammell*, 98 Tex. 364, 83 S.W. 1098 (1904)).

parties disputed the issue. Moreover, the complete contract provision at issue in *Felix* is not substantively similar to paragraph 26 in the construction contract before us. *Id*. at *1.

None of the cases cited by Chemical or James examines a waiver or considers whether contract language purporting to be a waiver, as we have here, is a covenant not to sue. Black's defines "waiver" as: "the intentional or voluntary relinquishment of a known right" or the "renunciation, repudiation, abandonment, or surrender of some claim, right, privilege, or of the opportunity to take advantage of some . . . wrong." Black's Law Dictionary 1580 (2d ed. 1990). Generally, the elements of waiver include (1) an existing right, benefit, or advantage held by a party, (2) the party's actual knowledge of its existence, and (3) the party's actual intent to relinquish the right, or intentional conduct inconsistent with the right. *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008); *Trelltex, Inc. v. Intecx, L.L.C.*, 494 S.W.3d 781, 790 (Tex. App.—Houston [14th Dist.] 2016, no pet.). Parties can waive common law rights by agreement,[38] and we respect their freedom of contract to do so.[39] Typical examples include consequential damage waivers or limitation-of-damage clauses, which generally are valid.[40]

---

[38] *See In re H.E. Butt Grocery Co.*, 17 S.W.3d 360, 374 (Tex. App.—Houston [14th Dist.] 2000, orig. proceeding); *Sedona Contracting, Inc. v. Ford, Powell & Carson, Inc.*, 995 S.W.2d 192, 196 (Tex. App.—San Antonio 1999, pet. denied) (discussing waiver of claims in bid form); *Martin v. Lou Poliquin Enters., Inc.*, 696 S.W.2d 180, 186 (Tex. App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.) (contractual damage limitation may waive damage rights under common law breach of contract theory).

[39] *See Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 230 (Tex. 2019); *Fortis Benefits v. Cantu*, 234 S.W.3d 642, 649 (Tex. 2007) (Texas has "long recognized a strong public policy in favor of preserving the freedom of contract"). Absent a compelling reason, courts must respect and enforce the terms of a contract that the parties have freely and voluntarily made. *Bombardier*, 572 S.W.3d at 230; *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 482 (Tex. 2017).

[40] *See El Paso Mktg., L.P. v. Wolf Hollow I, L.P.*, 383 S.W.3d 138, 143-44 (Tex. 2012); *Sw. Bell Tel. Co.*, 811 S.W.2d at 577 (limitation-of-liability clauses are generally valid and

Construing its plain language, paragraph 26 simply is not a categorical covenant not to sue. The provision does not say that the parties agree not to sue each other. *See Westergren*, 453 S.W.3d at 428-29; *Guggenheim Corp. Funding, LLC v. Valerus Compression Servs., L.P.*, 465 S.W.3d 673, 692-93 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) (declining to interpret contractual provision as covenant not to sue in the absence of explicit language preventing party from filing suit). For example, a lawsuit for direct damages is not prohibited. In contrast, the principal cases upon which James relies are materially different from today's case because the parties in *Perkins*, *Caspary*, and *Pape Equipment*, unlike Chemical, agreed not to sue, or to institute, or to participate in, any legal action. *Cf. Perkins*, 386 S.W.2d at 765 n.1; *Caspary*, 2000 WL 35729203, at *11; *Pape Equip.*, 737 S.W.2d at 400-01. Though the agreement in *Felix* did not contain that critical language, *Felix* is distinguishable for the reasons stated above. So, Chemical has not breached paragraph 26 by filing a lawsuit.

Paragraph 26 says that the parties will not be liable to each other for certain types of damages and will make no claims against the other for the proscribed damages regardless of the legal theory offered in support of them. Persuasively, courts in Texas and elsewhere have characterized contract language to the effect that no party "shall be liable to the other," and parties shall "make no claim" or "no claim shall be made," as a waiver. *See Le Norman Operating LLC v. Chalker Energy Partners III, LLC*, 547 S.W.3d 27, 32 (Tex. App.—Houston [1st Dist.] 2017, pet. granted) (contract providing "neither party shall be liable to the other party" for consequential damages was waiver); *MEMC Pasadena, Inc. v. Riddle Power, LLC*,

_____

enforceable); *DaimlerChrysler Motors Co. v. Manuel*, 362 S.W.3d 160, 183 (Tex. App.—Fort Worth 2012, no pet.); *Tenn. Gas Pipeline*, 2008 WL 3876141, at *6-8; *see also Vallance & Co. v. De Anda*, 595 S.W.2d 587, 589-90 (Tex. App.—San Antonio 1980, no writ) (discussing liquidated damages provision; contracting parties can limit their liability in damages to a specified amount).

472 S.W.3d 379, 385 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (same); *Perez-Gurri Corp. v. McLeod*, 238 So. 3d 347, 351 (Fla. Dist. Ct. App. 2017) (contract language stating "no claim . . . shall be made" for delay damages was part of waiver provision); *Barhorst v. Thatcher*, 144 N.E.2d 272, 274 (Ohio Ct. App. 1956).

We conclude that paragraph 26, read as a whole—including the "no claim shall be made" clause—evinces the parties' intent to relinquish any claim they may ever have for consequential damages arising under the construction contract.[41] The parties used language one would reasonably expect to be used in drafting a waiver of damages clause[42] and indeed entitled paragraph 26 "Waiver of Consequential Damages." *See RSUI Indemnity Co.*, 466 S.W.3d at 121 ("Generally, courts should construe contractual provisions in a manner that is consistent with the labels the parties give them."). Relinquishing a claim is the essence of a waiver, which can be accomplished by written agreement pre-dispute and pre-injury. *See Tenneco*, 925 S.W.2d at 643 (a party's express renunciation of a known right can establish waiver); *Sedona*, 995 S.W.2d at 196 (discussing waiver of claims in a bid form). Applying the traditional elements of waiver, (1) the parties waived a right existing at the time of contracting because they understood they had right to complain and seek damages in the event of a breach of contract; (2) the contract shows the parties' constructive knowledge of rights to sue for damages in the event of breach;[43] and (3) the language is clear that the parties intend to relinquish a right to claim certain types of damages

---

[41] The provision limits liability on other types of damages as well, but only consequential damages are at issue here.

[42] *Le Norman Operating*, 547 S.W.3d at 32; *MEMC Pasadena, Inc.*, 472 S.W.3d at 385; *Perez-Gurri Corp.*, 238 So. 3d at 351; *Barhorst*, 144 N.E.2d at 274.

[43] This is evident from at least paragraphs 9, 17, 19, and 21, already discussed at length. Also, paragraph 27 assigns Texas law as governing any "disputes" arising from the contract.

for breach. *See Sedona*, 995 S.W.2d at 196. We disagree with appellants that one small clause, excised from the whole paragraph, also constitutes a covenant not to sue when that intent is not plainly expressed. The part of paragraph 26 stating that "no claim shall be made" for the described damages regardless of the theory offered to support them merely defines the extent of the waiver.

We therefore agree with Chemical that paragraph 26 is a waiver of certain damages; it is not also a covenant not to sue. The difference between agreeing not to sue each other and agreeing to narrow the scope of recoverable damages in the event of suit is subtle but consequential.[44] Paragraph 26 is the latter agreement, not the former. James may (and did) assert paragraph 26 as an affirmative defense to Chemical's claims. But James is not entitled to recover attorney's fees under chapter 38 to the extent it prevailed on that defense. *See N. Star Water Logic, LLC v. Ecolotron, Inc.*, 486 S.W.3d 102, 107 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (party cannot recover fees for successfully defending breach of contract claim); *see also Green Int'l*, 951 S.W.2d at 390 ("To recover attorney's fees under Section 38.001, a party must (1) prevail on a cause of action for which attorney's fees are recoverable, and (2) recover damages."). In short, paragraph 26 means that James is not liable for any consequential damages, not that James may recover its attorney's fees for defending against Chemical's claims for consequential damages. We reject appellants' argument that paragraph 26 constitutes both a consequential damages waiver and a covenant not to sue.

We sustain Chemical's first cross-issue, which requires rendition of a take-nothing judgment on James's counterclaim for breach of paragraph 26. Accordingly, we need not reach appellants' sixth issue.

---

[44] Parties are presumed to know and understand the legal effect of their contracts and waivers. *Trelltex*, 494 S.W.3d at 792.

## B. Attorney's Fees Against James

In Chemical's second cross-issue, it contends that the trial court erred in denying Chemical recovery of attorney's fees against James. The judgment does not grant Chemical recovery of fees under section 38.001 against James because James is a limited liability company. This court and others have held that chapter 38 does not permit recovery of attorney's fees from a limited liability company. *Vast Constr.*, 526 S.W.3d at 728; *Alta Mesa*, 488 S.W.3d at 452-55. Chemical invites us to overrule our precedent in its second cross-issue. We decline Chemical's invitation, and in any event only an en banc majority can overrule this court's precedent. *See* Tex. R. App. P. 41.2(c). We overrule Chemical's second cross-issue.

## Conclusion

In sum, we hold the following.

We overrule appellants' first issue because the evidence is legally sufficient to support the jury's liability and damages findings regarding James's breach of paragraph 21.3, the termination provision. Due to our resolution of appellants' first issue, we do not reach their second and seventh issues, and we overrule their fifth issue. We overrule appellants' third issue because the evidence is legally sufficient to support the jury's liability and damages findings regarding James's breach of paragraph 19.1, the indemnity provision. We affirm the portion of the judgment awarding Chemical its breach-of-contract damages in the amount of $1,157,019.50, plus pre-judgment and post-judgment interest and taxable costs related to that sum as set forth in the judgment.

We overrule appellants' fourth issue because Chemical established that Primoris breached the Guaranty, and legally sufficient evidence supports the amount awarded. We affirm the portion of the judgment awarding to Chemical from

66

Primoris $2,923,600.50 in attorney's fees for representation through trial and the completion of proceedings in the trial court, plus post-judgment interest on that amount as set forth in the judgment.

We sustain Chemical's first cross-issue because paragraph 26 is not a covenant not to sue but is only a waiver of certain damages. Therefore, it cannot support a judgment for breach of contract. Due to our resolution, we do not reach appellants' sixth issue. We delete that portion of the judgment awarding damages to James on its counterclaim, and we render a take-nothing judgment in Chemical's favor as to that claim. We overrule Chemical's second cross-issue because chapter 38 does not permit recovery of attorney's fees against a limited liability company.

We affirm the trial court's judgment as so modified.


/s/     Kevin Jewell
         Justice


Panel consists of Chief Justice Frost and Justices Jewell and Bourliot. (Frost, C.J., concurring and dissenting).